**Frederick BROOKS et al., Plaintiffs,**

**v.**

**Beverly BRILEY, Mayor, etc., et al.,
Defendants.**

**Civ. No. 4747.**

United States District Court
M. D. Tennessee,
Nashville Division.

Oct. 9, 1967.

I. T. Creswell, Jr., Nashville, Tenn., Percy L. Julian, Jr., Madison, Wis., Howard Moore, Jr., Atlanta, Ga., Michael Standard, William Kunstler and Arthur Kinoy, New York City, Dennis J. Roberts and Harriet Van Tassel, Newark, N. J., and C. B. King, Albany, Ga., for plaintiffs.

Edwin F. Hunt, of Boult, Hunt, Cummings & Conners, Cecil D. Branstetter, James F. Neal, of Cornelius, Collins, Neal & Higgins, William J. Harbison, of Trabue, Minick, Sturdivant & Harbison, J. O. Bass, Sr., and J. Bradbury Reed, of Bass, Berry & Sims, Nashville, Tenn., for defendants.

Before PHILLIPS, Circuit Judge, and MILLER and GRAY, District Judges.

WILLIAM E. MILLER, District Judge.

In this action we are requested to strike down and to enjoin the enforcement of numerous state criminal laws and municipal ordinances for alleged vagueness and overbreadth and for invalidity as applied to plaintiffs and others similarly situated. Giving rise to the litigation were the North Nashville riots which occurred on April 8, 9 and 10, 1967, an outbreak of violence and lawlessness which led to police intervention and subsequent arrests and criminal charges.

For the reasons stated in this opinion we must emphatically reject the plaintiffs' invitation thus to shackle the law enforcement responsibilities of local authorities.

For the purpose of discussing and considering the pertinent issues, the laws challenged in this case may be divided into two categories: First, certain state statutes and laws under which, according to the proof, actual arrests and charges were made against named plaintiffs in the action, consisting of T.C.A. Sec. 39–4901 (carrying dangerous weapons), T.C.A. Sec. 39–1213 (disorderly conduct), and the common law offense, recognized in Tennessee, of inciting to riot (set forth in Appendix A to this opinion); and Second, other state laws and municipal ordinances under which, according to the proof, no arrests or charges or threats of such arrests or charges were made against any named plaintiff, or against any other person shown to have been involved in the April riots, consisting of T.C.A. Sec. 39–4701 (vagrancy), Metro Ordinance 66–928(14) (disorderly conduct); 66–928(16) (assembling to commit unlawful acts); 66–928(17) (assembling to disturb citizens or travelers); 66–928(46) (loitering); and 66–928(47) (loitering about schools). (Set forth in Appendix B to this opinion.)

Considered in its context, the action, basically, involves the right of state and municipal law enforcement authorities, including the local police, to cope effectively with a serious outbreak of violence and lawlessness without interference from the long arm of a federal injunction. As explained more fully later on in the course of this opinion, we find to be devoid of factual support, and indeed even fanciful, the plaintiffs' charge that policemen and other officers and officials of the Metropolitan Government of Nashville, combined or conspired in bad faith to harass the plaintiffs and to deprive them of their constitutionally protected rights. It is equally clear from the present record that the North Nashville riots of April 1967, which plaintiffs would euphemistically characterize as "disturbances" or "disorders," were neither caused nor aggravated by improper police methods, nor by the use of excessive force, nor by so-called police brutality. Contrariwise, the evidence unequivocally demonstrates that Nashville was confronted with an eruption of violence in no way caused by the police and having no rational connection with the enjoyment of civil rights or First Amendment freedoms—an outbreak which posed a grave threat to the peace and good order of the community, as well as to the security and welfare of its inhabitants.

It is in this context that we approach the legal problems posed by this case, and not against the background found to exist in some of the authorities relied upon by the plaintiffs, of peaceable assemblies, demonstrations, or other activities designed to protest a grievance or to advocate a cause.

The named plaintiffs are Frederick Brooks, a Negro citizen of the United States, a student at Tennessee State University in Nashville, and chairman of the Nashville Chapter of the Student Nonviolent Coordinating Committee (SNCC); George Ware, a Negro citizen of the United States, and field secretary of SNCC engaged in carrying out its purposes in Nashville; Ernest C. Stephens, a Negro citizen, and field secretary of SNCC engaged in carrying out its purposes in Nashville; Adrienne Lyn Jenkins, a Negro citizen, and a student at Fisk University in Nashville; Oscar L. Graham, a Negro citizen, and a student at Fisk University; Calvin M. Conner, a Negro citizen, and a student at Tennessee State University; Stokely Carmichael, a Negro citizen, and at the time of the filing of the complaint national chairman of SNCC, a position in which he was replaced after filing of the complaint by one H. Rap Brown; Aaron Neal, Jr., a Negro citizen, and a student at Tennessee State University; James E. Woodruff, a Negro citizen, and an Episcopalian priest whose parish is located in the City of Nashville; Larry Rabinowitz, a Caucasian citizen of the United States, employed in the City of Nashville; Diane Sealy, a Negro cit-

izen, and a student at Tuskegee Institute in Alabama. The named plaintiffs sue on behalf of themselves and on behalf of a class consisting of all members of the staff of SNCC, all students at Fisk and Tennessee State Universities, all Negroes in the schools and colleges in Nashville, as well as all Negro residents of said city similarly situated, the complaint alleging that such classes are too numerous to bring before the Court. Plaintiff SNCC, an unincorporated association, having a local chapter in Nashville, alleging that its aims and purposes are to promote and help secure to all Negro citizens the rights guaranteed to them under the Constitution of the United States, and that it seeks to advance these purposes by engaging in all forms of peaceful activities, such as free speech, assembly, and the petitioning of the Government for redress of grievances, sues in its own behalf.

The jurisdiction of the Court over the complaint is invoked under 28 U.S.C.A. Secs. 1331, 1332, 1343(3) and (4), 2201, 2202, 2281, and 2284; 42 U.S.C.A. Secs. 1971, 1981, 1983 and 1985; "The Voting Rights Act of 1965," and the Constitution of the United States, more particularly the First, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth, Thirteenth, Fourteenth and Fifteenth Amendments thereto.

The defendants named in the complaint, as amended, are Beverly Briley, Mayor of Metropolitan Nashville and Davidson County, Tennessee, (a unit of government hereinafter referred to as Nashville or as the City of Nashville); H. O. Kemp, Chief of Police of the City of Nashville; Bobby Hill, a member of the Police Department of the City of Nashville, individually and in his official capacity as representative of a class of police officers of said city which is alleged to be too numerous to bring before the Court; Neill S. Brown, Director of Law of the City of Nashville; Thomas Shriver, the District Attorney General for the Tenth Judicial Circuit of Tennessee; and R. C. Jackson, a member of the Police Department of the City of Nashville, individually and as a representative of other police officers of said city.

The plaintiffs' complaint, as amended, constitutes a two-fold attack upon the state laws and municipal ordinances set forth in Appendices A and B to this opinion. The first theory of the complaint is that the defendants caused arrests and prosecutions to be instituted against the plaintiffs, or have threatened such arrests and prosecutions under the said laws and ordinances, not in good faith for the purpose of valid law enforcement, but pursuant to a plan or scheme to harass the plaintiffs and to subject them to the deprivation of their federally protected rights, including freedom of speech, assembly, association and related activities. Secondly, the plaintiffs seek to support their claim for relief by alleging that the said statutes and ordinances are void for vagueness and overbreadth, consequently violating the fundamental guarantees of free speech, press, assembly, and the right to petition the government for redress of grievances. With respect to the occurrences of April 8, 9 and 10, in North Nashville, the plaintiffs allege that they were engaged solely in peaceful activities and that any acts of violence were caused by the defendants in using inflammatory remarks about the plaintiff Stokely Carmichael and others prior to said occurrences, in making unwarranted threats against him, by using improper police methods, by making illegal arrests, searches and seizures, and by resorting to the use of unnecessary force, as well as by placing unwarranted criminal charges against the plaintiffs, or some of them, for violating various laws and ordinances.

It is alleged that the prosecution of the plaintiffs under the said laws and ordinances will have destructive, intimidating and "chilling" effects upon federal rights guaranteed by the First Amendment, and that such prosecution will have identical effects upon the rights of every member of the class that the plaintiffs represent. Alleging irreparable injury incident to the arrests and proceedings under said laws and ordinances, the plaintiffs request a declaratory judgment that the

said laws and ordinances are void both as applied and on their face, and the issuance of an injunction enjoining and restraining the enforcement of the said laws and ordinances and any proceedings thereunder.

Without undertaking to summarize in detail the defensive pleadings, the defendants in their answer (a) deny that the plaintiffs, other than plaintiffs Ware, Stephens and Neal, have standing to maintain the action; (b) deny that the action is a proper class action; (c) deny that the defendants in any way acted in bad faith in connection with the occurrences of April 8, 9 and 10, 1967, or in invoking and using any law, statute, or ordinance; (d) deny that any of said laws are void for vagueness or overbreadth; and (e) contend that there is no showing of irreparable injury and that the doctrine of abstention should be applied by the Court, with the result that the Court should refrain from granting injunctive relief or from entering a declaratory judgment.[1]

▉▉ Since state statutes and laws having a general application were challenged as being violative of the Federal Constitution, a three-judge court was convened, pursuant to 28 U.S.C.A. Sec. 2281, and the action has been tried and heard by the Court on its merits.[2]

From the extensive proof developed at the hearing, the controlling facts leading to the litigation have emerged without serious conflict. During the Easter vacation of 1967, a "Conference of Black Students" was held in Nashville, sponsored by the Nashville Chapter of SNCC. The sessions of the conference were held at Fisk, and at Clark Memorial Methodist Church and St. Anselm's Episcopal Church near the Fisk campus. While there is some proof of police surveillance of some of these sessions, there was no police interference or harassment. The sessions were duly held as scheduled. In October 1966, the plaintiff Carmichael had been invited to speak on the campus of Fisk University in Nashville. He was not, however, scheduled as a speaker for the reason that officials of the University did not consider that he had accepted the invitation. It is clear from the evidence that neither the defendants nor anyone acting on their behalf had any connection with the fact that this speaking engagement was cancelled or not scheduled. On April 6, 7 and 8, 1967, the plaintiff Carmichael did make speeches in Nashville, at Fisk University, at Tennessee State University, and at Vanderbilt University. These speeches were made as scheduled without any interference or attempted interference from the defendants. While these appearances and speeches of Carmichael received extensive press coverage, the record is clear that his constitutional rights were not disrupted or in any way interfered with, certainly not by the defendants. The last of the scheduled speeches in Nashville was completed by Carmichael in an appearance on the Impact Program on the campus of Vanderbilt University in the late afternoon of April 8, 1967. Later, on the same evening, he was present at the scene of the rioting after it had begun. The rioting began in the vicinity of the campus of Fisk University. As stated, it first erupted on the evening of April 8, 1967; it continued on April 9th, and ended on:

1. The Honorable George F. McCanless, Attorney General of Tennessee, having been allowed to intervene as a party defendant in his official capacity, and to file responsive pleadings, filed an answer adopting the answer of the other defendants in the action insofar as such answer relates to the constitutionality of the general statutes of the State of Tennessee, and the common law offense of inciting to riot, challenged by the complaint.

2. A three-judge court would appear to have jurisdiction since the complaint with respect to three of the named plaintiffs challenges on federal constitutional grounds state laws of state-wide application. The allegations of bad faith are sufficient to raise a substantial constitutional question. Moody v. Flowers, 387 U.S. 97, 101, 87 S.Ct. 1544, 18 L.Ed. 2d 643 (1967).

April 10th. The events leading to the rioting were as follows:

At about 7:30 P.M. on April 8th, the Negro operator of the University Inn across the street from Fisk University summoned police to his premises because of the presence of a drunk and disorderly Negro soldier. In response to his call two white officers were directed to go to the restaurant in a patrol car. Prior to this call from the University Inn, there were no policemen in or around the premises or in the area where the rioting later began. At about 7:50 P.M. the operator of the University Inn had another call made requesting that police be sent to his restaurant at 1728 Jefferson Street. When the police arrived in response to the first call, they found that the Negro soldier had left but the operator of the establishment wished to eject another Negro patron offensive to him. The record shows that this was done without force and in a courteous manner. Two different police officers answered the second call. When they arrived the Negro soldier had returned. He was ejected at the operator's request from the University Inn. Within five to eight minutes after the arrival of the officers in response to the second call, and while they were still present, a number of persons, most of whom were Negro students, appeared and began picketing the University Inn. The crowd in the area gradually increased, whereupon some helmeted police arrived in the area. However, Dr. Edwin Mitchell, a Negro community leader and Director of the Nashville-Davidson County Human Relations Commission, who was in the area seeking to compose the situation, suggested that the helmeted police be removed. This request was complied with within a few minutes time. There remained at the scene two or three uniformed policemen concerned primarily with directing traffic. In an effort to work out the difficulty, a meeting was held at the University Inn between the operator and protesting students, at which time it was agreed by those attending to recess the meeting and to go outside in an attempt to disperse the crowd

and the pickets. This attempt was not fruitful as the crowd, many of whom were students of Fisk and Tennessee State Universities, continued to increase in numbers. Present in the crowd at this time were agitators, including known ex-convicts, who were exhorting the crowd to keep police out of the area, and the record supports the conclusion that these agitators rather than the pickets were the center of the crowd's attention. The crowd became increasingly aroused and hostile. At about 9.30 P.M., large numbers of persons making up the crowd surged in front of a public transportation bus, containing passengers, which was undertaking to go through the area. This resulted in some members of the crowd breaking out the bus window in front of the driver and rocking the bus to and fro, whereupon one of the agitators shouted, "This is a chance to get whitey." At this juncture, a plain clothes policeman fired his pistol into the air in order to disperse the crowd, and the bus then proceeded out of the congested area. The crowd was then large and hostile and numbered between 350 to 500 people. There appears to be no dispute in the evidence that the smashing of the glass in the bus window was the first actual violence which occurred. Prior to this event the police had not interfered in any way with the picketing or other activities, devoting themselves to directing or re-directing traffic in the area. After the bus incident, helmeted police reappeared at 17th Avenue and Jefferson Street when the crowd had increased and traffic policemen were being surrounded by large numbers. After the helmeted police formed a line across the street, large numbers of persons moved toward them in a menacing manner and in a hostile mood, coming within six to eight feet of the police line. At this time agitators ran up and down the area urging Negro policemen to leave their posts and to join the agitators, spitting upon the officers, using obscene and abusive language, and shouting "honkies go home," "let's get the honkies," and "black honkies." At approximately 10:00 o'clock a barrage of rocks and other missiles were thrown

from the crowd at the police and others with them, the missiles striking a number of persons, including Dr. Edwin Mitchell. The police had made no arrests prior to this incident, had taken no action against the agitators, and had remained in formation. After the rock throwing, they were ordered to disperse the crowd, and did so to a certain extent. There were isolated incidents of rock throwing in the area all night, the crowd dismantling a rock wall and throwing the rocks at policemen. The rioting spread out from its point of origin to other places and areas in North Nashville. It continued on April 9th, and before it ended on April 10th, buildings in the area had been burned, policemen's motorcycles damaged, automobiles with white drivers attacked with serious personal injury and property damage, "molotov cocktails" were used and others were made and secreted, and firearms were brought into the area. Arrests were undertaken by the police only after rioting and violence had erupted and were in progress. Thereafter during the remainder of April 8th and on April 9th and 10th, various arrests were made, but of the eleven named individual plaintiffs only three of them were arrested or charged with violations of any of the statutes or ordinances challenged by the complaint. None of the other eight individual plaintiffs is or has ever been so charged. Two of the plaintiffs named in the complaint, as amended, plaintiffs Woodruff and Rabinowitz, were arrested, long after the rioting, on the night of April 21, 1967, but were immediately released upon order of a local General Sessions Judge, no warrant and no charge ever being placed against them. At intervals during the events of April 8, 9 and 10, the police, in efforts to control the crowds, fired shots in the air. Three students while on the Fisk campus were struck by stray bullets, but there was no intentional firing on any student or any other person in the crowds.

On Saturday, April 8, 1967, the plaintiff Carmichael participated in a taped radio program at a radio station owned and operated by the Library Board of the Metropolitan Government. The program was scheduled to be played on Monday, April 10, 1967, but was not played because the North Nashville area had experienced two days of violence and rioting. For this reason the library officials concluded that it would be poor judgment to play the tape, a decision in which the Mayor concurred. Although the plaintiffs point to this incident as constituting evidence of a bad faith interference with their rights, the Court finds that the decision was made in good faith and in the proper exercise of discretion vested in local officials, with no right of the plaintiffs being violated thereby. It was also a proper exercise of discretion on the part of defendant, Mayor Briley, to undertake to prevent trouble by interceding on April 7, 1967 with the Episcopal Bishop. This was done apparently in the hope that SNCC would be barred from the use of defendant Father Woodruff's church near the Fisk campus. The Mayor had reasonable grounds to believe that serious trouble could occur in Nashville due to the presence of SNCC and its leaders.

■ The Court finds no credible evidence to support the allegations of the complaint that the plaintiffs, George Ware and Ernest Stephens, were assaulted by police enroute to jail. Nor is there any believable evidence of police brutality in this case on any other occasion, or of other police misconduct which either contributed toward causing or in precipitating the incident which led to the rioting. The conclusion upon the record is inescapable that the Police Department and its members exercised, with a few minor exceptions, extraordinary restraint and good judgment in undertaking to control the tumultuous situation. As already pointed out, the evidence is completely lacking to support the plaintiffs' complaint that the conduct or activities of the police or other local authorities in undertaking to deal with and control the rioting, including the arrests and charges which were made against individual plaintiffs, had or were calculated to have, under the circumstances, any "chilling effect" on the plaintiffs in the enjoyment

of any of their constitutional rights. The contrary is affirmatively shown by the serious nature of the occurrences with which the police had to deal, by the fact that they allowed speeches, picketing and demonstrations to take place and to continue without interruption so long as they were peaceful and orderly, that arrests were made only after violence erupted, and that in handling a dangerous and volatile situation the police used a proper measure of restraint and resorted to no police brutality or the use of excessive force. The same facts together with the lack of any contrary proof on the part of plaintiffs further show that there was no scheme or plan to harass the plaintiffs, or to invoke criminal laws for the purpose of interfering with their constitutional rights. Plaintiffs point to the facts that members of the Nashville police force were equipped with Michigan State police helmets, and that policemen were instantly available in large numbers as soon as the rioting began as evidence of a planned interference with the plaintiffs in the exercise of First Amendment rights. No such inference is justifiable. These facts merely demonstrate efficient police preparation to meet any emergency.

As a result of the riots the plaintiff Ware was arrested and was charged in a formal warrant with disorderly conduct in violation of T.C.A. Sec. 39–1213, with carrying a dangerous weapon in violation of T.C.A. Sec. 39–4901, and inciting a riot in violation of the common law offense. (Appendix A) The plaintiff Stephens was arrested and formally charged with disorderly conduct in violation of T.C.A. Sec. 39–1213, with carrying a dangerous weapon in violation of T.C.A. Sec. 39–4901, and inciting a riot in violation of the common law offense. (Appendix A) The plaintiff Neal was arrested and formally charged with inciting a riot in violation of the common law offense recognized in Tennessee. (Appendix A)

These criminal proceedings are still pending since the defendants have voluntarily refrained from prosecuting them during the pendency of this action. No other named plaintiff was arrested, charged, or threatened with arrest as a result of the riots under any of the laws and ordinances challenged by the complaint. Plaintiffs' Collective Exhibits 28, 29 and 31 set forth a number of arrest warrants charging various violations of laws included in both Appendix A and Appendix B. These exhibits, filed for identification, were not offered or admitted as evidence in the case. But an examination of the exhibits discloses no charge against any named plaintiff with the three exceptions indicated.

Plaintiff Neal testified that his arrest was accompanied by the arrest of six others, four of whom are identified as Mickey Booth, Charles Douglas, LeRoy Wilson, and Arnett Whitmire. All, according to Neal, were charged with inciting to riot. Booth's case was dismissed, and Douglas was fined $25.00. There is no proof of charges or threats against any member of the so-called class plaintiffs seek to represent other than the four persons, identified by Neal and charged with incitement to riot.

We address ourselves first to the question of whether the action may be maintained as a class action. As pointed out, the named plaintiffs seek to represent not only themselves but all Negro residents and students of Nashville who are similarly situated.

The plaintiffs in their brief contend that the class consists of every Negro resident of Nashville who might feel the necessity of making his voice heard and his presence felt in the quest for equal rights.

■ In order to maintain a class action the Federal Rules require, among other things, that there be questions of law or fact common to. the .class which the plaintiffs seek to represent and that the class be so numerous that joinder of all members is impracticable. Fed. R.Civ.P. 23. Plaintiffs claim that the proof warrants a finding that both common questions of law and fact are presented. More specifically, it is contended that the common questions of law and

fact are that the Negro class (all Negro students and residents of Nashville similarly situated) is being subjected to criminal prosecutions brought in bad faith, or to prosecutions under unconstitutionally vague statutes or ordinances, and that such prosecutions deprive class members of their First Amendment freedoms.

The Court is of the opinion that the evidence does not support this contention. With the exception of named plaintiffs Ware, Stephens and Neal, and four additional persons named in plaintiff Neal's testimony, there is no evidence of pending, threatened, or imminent prosecutions against any person having any connection with the occurrences of April, 1967, in North Nashville. As we have stated, the factual contention of bad faith prosecutions against Negro residents and students of Nashville is not supported by the record. The legal question as to statutory vagueness and overbreadth is common in this case only to named plaintiffs Ware, Stephens and Neal, and to the four additional persons identified in Neal's testimony.

■ It follows that the action is not an appropriate class action. While the question of vagueness and overbreadth of the common law offense of incitement to riot is common both to named plaintiffs Ware, Stephens and Neal, and to the four other persons named by Neal, certainly the presence of four additional persons does not constitute a class so numerous that joinder of them in this suit would be impracticable. Since the proof thus fails to establish the prerequisites of Rule 23, we hold that a class action may not be maintained in this case.

■■ It is equally apparent that the named plaintiffs, other than the three actually charged, are without standing to maintain the action and that it must be dismissed as to them. This is true because they have sustained no injury. They have not been charged with violating any law. Nor are they threatened with arrest or prosecution under any law sought to be challenged in this case. The

power of a court to declare a statute unconstitutional exists only where the plaintiff is "able to show, not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement * * *." Frothingham v. Mellon, 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923).

■ It is fundamental that the constitutionality of a statute or ordinance may not be challenged by one whose rights are not adversely affected, or about to be adversely affected, by its operation. Alabama State Federation of Labor Local Union No. 103, etc. v. McAdory, 325 U.S. 450, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945); Frothingham v. Mellon, supra; United States v. Lauer, 287 F.2d 633 (7th Cir. 1961), cert. den. 368 U.S. 818, 82 S.Ct. 34, 7 L.Ed.2d 24 (1961). A person is without standing to challenge the constitutionality of a statute unless he shows that he himself is injured by its operation. Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953).

In the instant case there is no showing that named plaintiffs Brooks, Jenkins, Graham, Conner, Carmichael, Woodruff, or Rabinowitz have been arrested, or are now threatened with arrest and prosecution, under any of the allegedly unconstitutional laws, as a result of the events of April 8, 9 and 10, 1967. While the plaintiff Diane Sealy was arrested in connection with such events, she was immediately released. There is no evidence that she is now or has ever been threatened with prosecution under any of the laws involved in this case. Nor has any legal action been taken or threatened against the Student Nonviolent Coordinating Committee under any law here subjected to attack.

We conclude that all of these named plaintiffs are without standing to challenge any of the statutes, ordinances, or laws or to maintain or join in the action.

■ We next consider the question whether the Court should enjoin the enforcement of the three laws which the plaintiffs Ware, Stephens and Neal

have standing to challenge. The plaintiffs cite and primarily rely upon the Supreme Court's decision in Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). In *Dombrowski* the appellants filed suit under 42 U.S. C.A. Sec. 1983 seeking declaratory relief and an injunction restraining Louisiana authorities from prosecuting or threatening to prosecute appellants under the Louisiana Subversive Activities and Communist Control Law and the Communist Propaganda Control Law. Appellants were members of the Southern Conference Educational Fund, Inc., an organization active in fostering civil rights for Negroes in the South. The Supreme Court found both laws unconstitutional on their face and granted the requested relief. The complaint alleged "that the statutes on their face violate the First and Fourteenth Amendment guarantees securing freedom of expression, because overbreadth makes them susceptible of sweeping and improper application abridging those rights", and that threats to enforce the statutes were not "made with any expectation of securing valid convictions, but rather are part of a plan to employ arrests, seizures, and threats of prosecution under color of statutes" in an effort to harass and discourage plaintiffs in the exercise of their First Amendment freedoms.

The Supreme Court stated the facts in *Dombrowski* to be as follows:

Early in October 1963 appellant Dombrowski and intervenors Smith and Waltzer were arrested by Louisiana state and local police and charged with violations of the two statutes. Their offices were raided and their files and records seized. Later in October a state judge quashed the arrest warrants as not based on probable cause, and discharged the appellants. Subsequently, the court granted a motion to suppress the seized evidence on the ground that the raid was illegal. Louisiana officials continued, however, to threaten prosecution of the appellants, who thereupon filed this action in November. Shortly after the three-judge court was convened, a grand jury was summoned in the Parish of Orleans to hear evidence looking to indictments of the individual appellants. On appellants' application Judge Wisdom issued a temporary restraining order against prosecutions pending hearing and decision of the case in the District Court. Following a hearing the District Court, over Judge Wisdom's dissent, dissolved the temporary restraining order and, at the same time, handed down an order dismissing the complaint. Thereafter the grand jury returned indictments under the Subversive Activities and Communist Control Law against the individual appellants.

These events, together with repeated announcements by appellees that the appellant organization is a subversive or Communist-front organization, whose members must register or be prosecuted under the Louisiana statutes, have appellants allege, frightened off potential members and contributors. [Citations omitted] Seizures of documents and records have paralyzed operations and threatened exposure of the identity of adherents to a locally unpopular cause. [Citation omitted] Although the particular seizure has been quashed in the state courts, the continuing threat of prosecution portends further arrests and seizures, some of which may be upheld and all of which will cause the organization inconvenience or worse. Id. at 487–489, 85 S.Ct. at 1121.

In reaching its decision the Supreme Court "recognized that federal interference with a State's good-faith administration of its criminal laws is peculiarly inconsistent with our federal framework." The Court was of the opinion nevertheless, that in the case before it defense of the state's criminal prosecution would not assure adequate vindication of constitutional rights and that such prosecution and threats of prosecution should be enjoined, for "the chilling effect upon the exercise of First Amendment rights may derive from the fact of prosecution, unaffected by the pros-

pects of its success or failure." Id. at 487, 85 S.Ct. at 1121.

The factual pattern in the case now before the Court is a far cry from that existing in *Dombrowski*. In that case the threatened prosecutions were preceded by arrests, and by investigations and seizures, designed solely to harass and dissuade plaintiffs in their civil rights activities. Threats of prosecution continued even after arrest warrants had been quashed and seized evidence had been suppressed by a state judge. The plaintiffs' homes and offices were raided and ransacked at gunpoint. Files, membership lists, and records were removed. Future arrests were clearly imminent.

On the other hand, the evidence here in all respects affirmatively demonstrates the good faith of the defendants, including the Nashville police, in all relevant arrests, charges, and law enforcement activities growing out of the events of April 8, 9 and 10, 1967, as well as on occasions prior and subsequent thereto. As correctly stated by defendants in their brief, at no time was there any interference with the picket line initially established. Nor was there any effort to suppress the picket line or other form of legitimate expression in any manner. The police arrested no one until violence had erupted. The arrests that were made arose out of violence and lawlessness rather than out of First Amendment protected activities present in *Dombrowski*. The police used only such force as was necessary to contain the rioting and to restore law and order to the area. Moreover, the arrests were not preceded by investigations designed solely to harass or inhibit First Amendment freedoms.

Another differentiating factor is that there is not present here, as there was in *Dombrowski*, any showing of a "chilling effect" on free expression or other protected activity occasioned by prosecutions initiated or threatened. The record affords no support for the contention that a substantial loss or impairment of First Amendment freedoms will occur if plaintiffs must await the state court disposition of the charges pending against them. Indeed, there was nothing connected with the defendants' handling of the North Nashville riots which reasonably or logically could have instilled in the plaintiffs any reason not to engage freely in lawful activity, or have caused them to stand in fear of police interference or intimidation. As long as the picket line was peaceful and unaccompanied by violence it continued without interruption. Only when lawlessness erupted were arrests made. At all times, with some minor exceptions, the police acted with moderation and restraint. The complaint in this case of a "chilling effect" or of a fear to speak and act freely within lawful limits is wholly, self-serving and without justifiable factual support. There is no showing of irreparable injury which is requisite to justify federal equitable relief, or of the special circumstances that would warrant federal disruption of the normal pattern of raising constitutional defenses in the course of state criminal proceedings. There is a fully adequate remedy available to the plaintiffs in the defense of their state court proceedings. If the challenged laws (Appendix A) are void for vagueness or overbreadth, the state courts are fully capable of so ruling, and there is no reason in this case to suppose that they would not do so. Or, as an alternative, the state courts may find that the laws, although facially challengeable, may be saved by an appropriate limiting construction. Cf. Dombrowski v. Pfister, supra.[3]

---

3. Indeed it is admitted by plaintiffs that Tennessee's statute prohibiting "Carrying Dangerous Weapons," T.C.A. Sec. 39–4901 (Appendix A) is constitutional on its face. As to this statute plaintiffs fall back upon the bad faith enforcement argument which we find to be groundless. Tennessee courts should have no difficulty whatever in confining the common law offense of "inciting to riot" (Appendix A) within appropriate constitutional limitations as requiring elements of persuasions and exhortations to mob violence as distinguished from protected activity under the First Amendment. Cf. Cantwell v. State of Connecticut, 310

While the *Dombrowski* opinion contains language which may be susceptible of the interpretation that abstention is never appropriate where statutes regulating expression are properly challenged for facial vagueness or overbreadth, we do not believe that the Supreme Court has committed itself to such a doctrinaire position where, as here, there is no predicate for finding either a bad faith invocation or use of criminal laws, or chilling effects or irreparable injury if state criminal proceedings are allowed to continue. This would appear to be indicated by the Supreme Court's per curiam affirmance, after its *Dombrowski* decision, of Wells v. Hand, 238 F.Supp. 779 (M.D. Ga.1965), aff'd sub nom. Wells v. Reynolds, 382 U.S. 39, 86 S.Ct. 160, 15 L.Ed.2d 32 (1965) in which the district court had denied injunctive relief to the plaintiffs from prosecution under one of Georgia's anti-insurrectional circulation laws. The district court's holding was that:

> There has been no showing that these Plaintiffs will not be afforded adequate protection with respect to their contentions in the state court. As already

noted, the alleged invalidity of a state law is not of itself grounds for equitable relief in a federal court. The controlling question is whether the Plaintiffs have made a sufficient showing that the need for equitable relief by injunction is urgent in order to prevent great and irreparable injury. American Federation of Labor v. Watson, 327 U.S. 582, 66 S.Ct. 761, 90 L.Ed. 873 (1946). The injunctive relief sought in this complaint against the enforcement of a state penal statute, even if that statute is contrary to the federal Constitution, must be measured by the extraordinary circumstances rule and considerations of whether the danger of irreparable loss is both great and immediate. The mere fact that the Plaintiffs may be convicted in the state court does not create such extraordinary circumstances as would justify an injunction and it has been frequently held that a federal court should not ordinarily interfere with state officers charged with the duty of prosecuting offenders against state law. Id. 238 F.Supp. at 786.[4]

---

U.S. 296, 308, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) ; United States v. Woodard, 376 F.2d 136, 143 (7th Cir. 1967) ; Kasper v. State, 206 Tenn. 434, 326 S.W.2d 664 (1959), cert. den., 361 U.S. 930, 80 S.Ct. 374, 4 L.Ed.2d 355 (1960) ; 77 C.J.S. Riot § 1, at 421 (1952). More difficulty is encountered with Tennessee's "Disorderly Conduct" statute, T.C.A. Sec. 39–1213. (Appendix A) But here too the possibilities for an interpretation circumscribing the reach of the statute within bounds of constitutionality cannot be discounted. The state courts may confine the statute to situations whose tendency is to provoke violence and bloodshed. Cf. Cantwell v. State of Connecticut, supra; Chaplinsky v. State of New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) ; United States v. Woodard, supra; State v. Smith, 46 N.J. 510, 218 A.2d 147, cert. den., 385 U.S. 838, 87 S.Ct. 85, 17 L.Ed.2d 71 (1966). Plaintiffs' reliance upon the three-judge court decision in Carmichael v. Allen, N.D.Ga., Dec. 13, 1966, 267 F.Supp. 985, in which the court, refusing abstention, declared Atlanta's Disorderly Conduct ordinance void, is in our opinion misplaced. In

that case the court made no attempt to consider the possibilities of a narrowing construction and, in declaring the ordinance void, relied upon Supreme Court decisions reviewing state-court convictions in which the state courts had been given the opportunity to adopt a limiting construction but had not done so.

4. The Georgia statute involved in *Wells*, Ga.Code Sec. 26–904, provided as follows:

> "Circulating insurrectionary papers. If any person shall bring, introduce, print, or circulate, or cause to be introduced, circulated, or printed, or aid or assist, or be in any manner instrumental in bringing, introducing, circulating, or printing within this State any paper, pamphlet, circular, or any writing, for the purpose of inciting insurrection, riot, conspiracy, or resistance against the lawful authority of the State, or against the lives of the inhabitants thereof, or any part of them, he shall be punished by confinement in the penitentiary for not less than five nor longer than 20 years."

For a discussion of the meaning of *Dombrowski* and expression of the view

Moreover, as Mr. Justice Black has recently construed the *Dombrowski* opinion, the court in that case authorized federal court injunctions against threatened enforcement of a state penal statute attacked on the ground of vagueness and overbreadth only "where it was also alleged that the statute was part of a plan 'to employ arrests, seizures, and threats of prosecution' under the statute in a way that would discourage the complainants and their supporters from asserting and attempting to vindicate their constitutional rights." Cameron v. Johnson, 381 U.S. 741, 748, 85 S.Ct. 1751, 1755, 14 L. Ed.2d 715 (1965) (Black, J., dissenting). See also Duncombe v. State of New York, 267 F.Supp. 103 (S.D.N.Y.1967), where Justice Black's explanation was adopted.

There are also several three-judge court cases in which a similar conception of the *Dombrowski* ruling has been applied. In Turner v. LaBelle, 251 F.Supp. 443 (D.C.Conn.1966), members of a civil rights organization had been arrested under a statute providing criminal penalties for one who "advocates, encourages, justifies, praises, incites, or solicits" injury to or destruction of property or assaults upon the police. The court held:

> [T]here has been no showing of irreparable harm. While there was some testimony that there had been a curtailment of civil rights activity, it has not been shown that this has been caused by the prosecution of plaintiffs or that an injunction will affect matters. There has been no showing of a falloff in membership, in applications for membership, or in contributions. Nor has there been any seizure of vital records and documents, as in Dombrowski, so as to paralyze NECAP's operations. In short, there has been no showing that plaintiffs will not adequately be protected by awaiting the state court's disposition of the matter. As in Wells, no plaintiff is in jail, or being deprived of any defense, and plaintiffs merely wish a determination

here of a constitutional question which should first be considered by the state court. Id. at 447.

In Zwickler v. Koota, 261 F.Supp. 985 (E.D.N.Y.1966), the plaintiff was threatened with prosecution under a statute prohibiting the distribution of anonymous political literature in quantity. The court held that it could not properly exercise federal equity power in that there was no suggestion that the alleged threatened criminal prosecution would be undertaken in bad faith or that the plaintiff's defense to any such prosecution would not assure him adequate vindication of his constitutional rights. In an earlier case the challenged statute had been held unconstitutional as a whole by a lower New York court.

And finally, in Zwicker v. Boll, 270 F.Supp. 131 (W.D.Wis.1967), the plaintiffs had staged an anti-war demonstration at the University of Wisconsin and had been arrested under the Wisconsin Disorderly Conduct statute. The court held that the statute was easily susceptible of a constitutional construction and that there was every reason to believe that the Wisconsin courts would so limit it.

In summary, we find that the defendants and the Nashville police have not attempted at any time to inhibit the plaintiffs' First Amendment freedoms, that the arrests which were made grew out of violent, not constitutionally protected, activities, and that the pending state court prosecutions have in no way chilled the plaintiffs' First Amendment freedoms. In situations such as this the Supreme Court has always refused injunctive relief. In Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943), the Court refused to enjoin the application of a city ordinance to religious solicitation in spite of the fact that on the same day the Court held the ordinance unconstitutional as so applied on review of a criminal conviction under it. Murdock v. Commonwealth of

---

that the court in *Wells* by "denying relief on a record devoid of evidence of bad faith * * * shortened the

reach of *Dombrowski*," see Note, 75 Yale L.J. 1007, 1033–37 (1966).

Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943).

It is a familiar rule that courts of equity will not ordinarily restrain criminal prosecutions. The imminence of good faith prosecution, even though alleged to be unlawful, is not of itself a sufficient ground for equitable relief since equity will exert its powers only to prevent irreparable injury. Beal v. Missouri Pacific Railway Corp., 312 U.S. 45, 61 S.Ct. 418, 85 L.Ed. 577 (1945); Spielman Motor Sales Co. v. Dodge, 295 U.S. 89, 55 S.Ct. 678, 79 L.Ed. 1322 (1935); Fenner v. Boykin, 271 U.S. 240, 46 S.Ct. 492, 70 L.Ed. 927 (1926). It is only when absolutely necessary to protect constitutional rights, and where the danger of irreparable harm is both great and immediate, that courts of the United States have power to enjoin state officers from instituting criminal actions. Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

In the absence of a finding of irreparable injury, federal interference with the state's good faith administration of its criminal laws would do violence to the policies of federalism and comity which we must respect. A policy of intervention in such cases, especially in the wake of the kind of lawlessnesss which occurred in Nashville, could only lead to federal judicial censorship of local law enforcement, to disruption of the delicate division of authority between federal and state governments, and ultimately to disrespect for the law itself.

The judiciary, as well as all other departments and agencies of government, must remain inflexibly dedicated to the rule of law and the fair and orderly administration of justice if our constitutional-democratic system is to endure. "[R]espect for judicial process is a small price to pay for the civilizing hand of law, which alone can give abiding meaning to constitutional freedom." Walker v. City of Birmingham, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967).

There is yet another reason why the state court prosecutions cannot be enjoined in this case. In *Dombrowski,* since the only persons arrested had been released prior to the institution of the action, the Supreme Court indicated in a footnote that 28 U.S.C.A. Sec. 2283,[5] which prohibits federal courts from granting an injunction to stay proceedings in a state court except as expressly authorized by act of Congress, did not preclude an injunction in that case. Dombrowski v. Pfister, supra, 380 U.S. at 484 n. 2, 85 S.Ct. 1116, 14 L.Ed.2d 22. The Court in *Dombrowski* did not have to consider the question of whether suits under 42 U.S.C.A. Sec. 1983 [6] come under the "expressly authorized" exception to Sec. 2283. A ruling on the point was reserved.

In the later case of Cameron v. Johnson, supra, the Supreme Court remanded the case to the lower court for reconsideration in the light of *Dombrowski* and directed the three-judge court on remand to consider the question whether Sec. 2283 barred an inunction. In that case prior to the institution of the federal court action, the plaintiffs had been arrested and indicted and their motion to quash had been overruled.

Upon remand, the three-judge court held that Sec. 2283 is a limitation on the exercise of the equity jurisdiction of the federal courts and that Sec. 1983 does not create an exception to that anti-in-

5. 28 U.S.C.A. Sec. 2283 provides:
A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

6. 42 U.S.C.A. Sec. 1983 provides:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

junction statute. Cameron v. Johnson, 262 F.Supp. 873 (S.D.Miss.1966). The court relied upon the earlier case of Baines v. City of Danville, 337 F.2d 579 (4th Cir. 1964), cert. den., Chase v. McCain, 381 U.S. 939, 85 S.Ct. 1772, 14 L.Ed.2d 702 (1965), which had reached the same result. Cases in the Sixth and Seventh Circuits have also held that Sec. 1983 is not an expressly authorized exception to Sec. 2283. Wojcik v. Palmer, 318 F.2d 171 (7th Cir. 1963), cert. den. 375 U.S. 930, 84 S.Ct. 331, 11 L.Ed.2d 263 (1963); Sexton v. Barry, 233 F.2d 220 (6th Cir. 1956). While two federal courts have reached a contrary result, significantly both courts in the exercise of equitable discretion refused to grant the injunction. Cooper v. Hutchinson, 184 F.2d 119 (3d Cir.1950); Tribune Review Publishing Co. v. Thomas, 153 F.Supp. 48 6(W.D.Pa.1957).

 As has already been pointed out in the statement of facts, proceedings against plaintiffs Ware, Stephens and Neal have been instituted and are pending in the Tennessee state courts for the violation of three Tennessee laws. While there is no express authority one way or the other, the Court is of the opinion that the arrest and the issuance of a warrant by a magistrate, a state judicial officer, formally charging the plaintiffs with criminal violations, constitute "proceedings" within the meaning of Sec. 2283.

 The weight of authority and the better reasoned approach require a decision that Sec. 2283 prohibits the enjoining of these state proceedings and that Sec. 1983 is not an "expressly authorized" exception to Sec. 2283. To hold otherwise would be to create a vast exception to Sec. 2283 and would do violence to the principles of comity and federalism which underlie it. Throughout our history the statute and its predecessors have played an important role in our federal system in curtailing "needless friction between state and federal courts." Oklahoma Packing Co. v. Oklahoma Gas & Electric Co., 309 U.S. 4, 9, 60 S.Ct. 215, 218, 84 L.Ed. 447 (1940).

 Furthermore, it is clear that the prohibition under Sec. 2283 against enjoining state court proceedings cannot be avoided by seeking a declaratory judgment. H. J. Heinz Co. v. Owens, 189 F.2d 505 (9th Cir. 1951), cert. den. 342 U.S. 905, 72 S.Ct. 294, 96 L.Ed. 677 (1952). The same principles of comity and federalism require that when injunctive relief is not appropriate, neither is relief appropriate under the declaratory judgment statute.

In our dual system of government we have rejected the concept of a national police force. Instead, we have committed to state and municipal authorities the primary responsibility for police protection and for the maintenance of law and order. Lacking such responsibility, the federal authority should be allowed to intrude itself through the Federal Courts into the law enforcement duties and activities of the states only when the necessity for such intrusion is clear and unmistakable. The importance of federal judicial restraint and caution in this area of state activity is emphasized in today's climate of rioting, lawlessness and violence—a national pattern of which the Nashville riots of last April were only a part.

As we view the record, our intervention in this case is not required to protect the constitutional rights of any person. It could only serve to disrupt and impede local authorities in coping with situations involving open defiance of law and threatening the peace and tranquility of the community.

For the reasons set forth the relief requested in the complaint, as amended, will be denied and the plaintiffs' action will be dismissed. This opinion will constitute the Court's Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52. Judgment has this day been entered in accordance with this opinion.

HARRY PHILLIPS, Circuit Judge, concurs in the foregoing opinion.

FRANK GRAY, Jr., District Judge, files a separate concurring opinion which is attached hereto.

## 554

### APPENDIX "A"

The following laws are those under which one or more of the named plaintiffs have been arrested and charged as a result of the events of April 8, 9 and 10, 1967:

T.C.A. Sec. 39–1213 (1966 Cum. Supp.) *"Disorderly conduct declared a misdemeanor—Definition—Penalty.* It shall be a misdemeanor for any person to engage in disorderly conduct, which is defined as the use of rude, boisterous, offensive, obscene or blasphemous language in any public place; or to make or to countenance or assist in making any improper noise, disturbance, breach of the peace, or diversion, or to conduct oneself in a disorderly manner, in any place to the annoyance of other persons. Any person violating the provisions of this section shall, upon conviction therefor, be fined not less than two dollars ($2.00) nor more than fifty dollars ($50.00); and in the discretion of the court be confined in the county jail or workhouse for not more than thirty (30) days."

T.C.A. Sec. 39–4901 *"Carrying dangerous weapons—Penalty—*Any person who shall carry in any manner whatever with the intent to go armed, any razor, dirk, bowie knife or other knife of like form, shape or size, sword cane, ice pick, sling shot, blackjack, brass-knucks, spanish stilletto, or a fountain pen pistol or gun, or like instrument containing a firing pin capable of shooting tear gas or pistol cartridges, or any pistol or revolver of any kind whatever, except the army or navy pistol which shall be carried openly in the hand, or any other dangerous weapon, shall be guilty of a misdemeanor.

Any person guilty of such offenses shall be subject to presentment or indictment, and on conviction shall be fined fifty dollars ($50.00), and imprisoned in the county jail, imprisonment only in the discretion of the court; provided, the defendant shall give good and sufficient security for all the cost, fine and any jail fees that may accrue by virtue of his imprisonment."

Inciting a Riot—There is no statutory charge of riot or inciting a riot in Tennessee. Kasper v. State, 206 Tenn. 434, 326 S.W.2d 664 (1959), did, however, recognize and hold it to be a common law offense in Tennessee.

### APPENDIX "B"

The following laws are those under which none of the named plaintiffs has been arrested and charged as a result of the events of April 8, 9 and 10, 1967:

T.C.A. Sec. 39–4701 *"Vagrancy a misdemeanor—*It shall be a misdemeanor for a person having no apparent means of subsistence to neglect to apply himself to some honest calling; or for any person to be found loitering about gambling houses, or houses of ill fame, or strolling through the country without any visible means of support."

*Metropolitan Bill No. 66–928 (Aug. 16, 1966) ORDINANCES:*

Section 14. *Disorderly conduct*

Any person who disturbs the peace of others by violent or offensive conduct, or carriage, or by loud or unusual noises, or by profane or obscene or offensive language, or any person who shall commit any act or diversion causing or tending to be a breach of the peace, or any person who shall be guilty of lewd, immoral or indecent conduct, or any person who shall use any obscene or filthy language in a public place, or any person who shall commit any act or diversion tending to or calculated to debauch the morals of any person shall be deemed guilty of disorderly conduct.

Section 16. *Assembling to commit unlawful act.*

It shall be unlawful for any two (2) or more persons to assemble together in the area of the Metropolitan Government with an intent to do an unlawful act; or, being assembled, mutually to agree, or act in concert, to do an unlawful act with force or violence against the property of the Metropoli-

tan Government, or the person or property of another, or against the peace and to the terror of others; or to make any move or preparation therefor; or, being present at such meeting or assembly, to fail to endeavor to prevent the commission of or perpetration of such unlawful act.

Section 17. *Assembling to disturb citizens or travelers.* It shall be unlawful for two or more persons to collect in bodies cr crowds for unlawful purposes, or for any purpose, to the annoyance or disturbance of citizens or travelers.

Section 45. *Vagrancy.*

It shall be unlawful for any person to have the status or condition of or to be a vagrant in the area of the Metropolitan Government. The following persons shall be deemed vagrants:

1. Any person having no lawful means of employment and having no lawful means of support realized solely from lawful occupations or sources; or, any person who lives idly and without visible means of support.

2. Any person found loitering or strolling in, about, or upon any street, lane, avenue, alley, or any other public way or public place, or at any public gathering or assembly, or in or around any store, shop, or business or commercial establishment, or on any private property or place without lawful business and conducting himself in lewd, wanton or lascivious manner in speech or behavior.

\* \* \* \* \* \*

7. Any person who wanders about the streets, alleys, or other public ways or places, or who is found abroad at late or unusual hours in the night without any visible or lawful business and not giving a satisfactory account of himself.

\* \* \* \* \* \*

Section 46. *Loitering prohibited*

It shall be unlawful for any person or persons to be upon any public way or place of public nature in such manner as to:

1. Interfere with the free and unobstructed use of such public way or place of public nature by any other person or persons; or,

2. To be profane, lewd or wanton in speech or behavior in such public way or place.

Section 47. *Loitering and other acts in or about schools—Unlawful*

It shall be unlawful for any person to loiter, idle, wander, stroll, or play in, about, or on any public, private, or parochial school, college, or seminary grounds, or buildings, either on foot or in or on any vehicle, without having some lawful business therein or thereabout, or in connection with such school or the employees thereof; or for any person to:

1. Annoy, disturb, or otherwise prevent the orderly conduct of classes and activities of any such school; or

2. Annoy, disturb, assault, or molest any student or employee of any such school, college, or seminary while in any such school building or on any school grounds; or

3. Conduct himself in a lewd, wanton, or lascivious manner in speech or behavior in or about any such school building or school grounds; or

4. Park or move a vehicle in the immediate vicinity of, or on the grounds of any such school, college or seminary for the purpose of annoying or molesting the students or employees thereof; or in an effort to induce, entice, or invite students into such vehicles for immoral purposes.

FRANK GRAY, Jr., District Judge (concurring):

*I concur in the conclusions set forth in Chief Judge Miller's opinion, concurred in by Judge Phillips, that injunctive relief should be denied and that plaintiffs' action should be dismissed. Insofar as Tennessee's disorderly conduct statute is concerned, I arrive at the conclusion that*

an injunction is not warranted by a different road from that traveled by my brethren.

This statute, in pertinent part, is as follows:

"It shall be a misdemeanor for any person to engage in disorderly conduct, which is defined as the use of rude, boisterous, offensive, obscene or blasphemous language in any public place; or to make or to countenance or assist in making any improper noise, disturbance, breach of the peace, or diversion, or to conduct oneself in a disorderly manner, in any place to the annoyance of other persons."

Codified as T.C.A. 39–1213, this is a comparatively new addition to the criminal provisions of Tennessee law, having been enacted by the General Assembly in 1961. It has not yet been construed by the Supreme Court of Tennessee.

In my opinion, the statute is so vague and overbroad, and so lacking in specificity of the conduct sought to be proscribed, as to be unconstitutional on its face. I do not find in it any saving provisions which would make possible interpretations circumscribing its reach within the bounds of constitutionality. Cf. Chaplinsky v. State of New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); Zwicker v. Boll, 270 F.Supp. 131 (W.D.Wisconsin 1967); United States v. Woodard, 7 Cir., 376 F.2d 136 (1967).

In deciding that injunctive relief should be denied plaintiffs Ware and Stephens, the only plaintiffs shown by the record to have been charged with violation of this statute, I do not believe it necessary to decide that 28 U.S.C. § 2283 prohibits the issuance of an injunction. The evidence adduced herein fails to show great and immediate danger of irreparable harm to these plaintiffs in the absence of an injunction; it fails to show that such relief is absolutely necessary to protect their constitutional rights. The courts of Tennessee are as bound by the provisions of the Constitution of the United States as is this court, and there is no reason to assume that they will not protect these plaintiffs from any violation of their constitutional rights. Equity does not require injunctive relief; indeed, on the record made here, equity forbids it.