STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT-CROSS-APPELLANT, v. FRANK SCHULTZ, DEFENDANT-APPELLANT-CROSS-RESPONDENT.

Argued September 14, 1976—Decided December 2, 1976.

591

*Mr. Harvey Weissbard* argued the cause for appellant-cross-respondent (*Messrs. Russell and McAlevy,* attorneys).

*Mr. David S. Baime,* Deputy Attorney General, argued the cause for respondent-cross-appellant (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney; *Ms. Barbara Ann Villano,* Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

CONFORD, P. J. A. D., Temporarily Assigned. Defendant, a Jersey City patrolman at the time of the events here of concern, was convicted of violation of the forgery statute, *N. J. S. A.* 2A:109–1, and of misconduct in office. The Appellate Division in an unreported opinion affirmed the conviction for misconduct, but reversed that for forgery,

holding the motion for acquittal on that charge should have been granted. Defendant had also been indicted for conspiracy to violate *N. J. S. A.* 2A:135–3 (public employees unlawfully obtaining state or municipal funds) and for a substantive offense under the same statute, but was acquitted of those charges at the same trial. One of the alleged co-conspirators, Kelly, a patrolman, was tried with defendant and was acquitted of conspiracy and the underlying substantive offense as well as of misconduct in office. The other alleged co-conspirator, Phillip Verga, an employee in the Violations Bureau of the Jersey City Municipal Court, had his charges severed for trial.

The case is here on grant of certification on petitions of both defendant and the State. 69 *N. J.* 79 (1975).

At the trial the State offered proof of the following facts. In October 1971 a parking ticket for a fire hydrant violation in Jersey City was issued to a vehicle owned by one Whritenour. In December 1971 his fiancee, Cathy Colfax, mailed the ticket with a $30 check to the Municipal Court; this was intended to pay the stated fine of $25 and a $5 late fee (the fine for this category of violation had been reduced to $10 in March 1971 but the city was still using the obsolete ticket forms stating the higher fine of $25).

Around the beginning of January 1972 defendant came into possession of the Colfax check which had been returned to the Violations Bureau by the drawee bank for insufficient funds. The only explanation of record for that possession was the testimony of defendant and a statement given by him to the prosecutor. That testimony is recounted hereinafter. Defendant at the time was precinct clerk for the Seventh Police Precinct, at whose headquarters building the Violations Bureau and a municipal courtroom were also coincidentally situated. As precinct clerk defendant was an administrative assistant to the precinct captain. While his duties brought him into contact with the Municipal Court and Violations Bureau, he had no responsibilities in either body, particularly in respect of collection or pay-

ment of traffic or parking violations. Nevertheless, the defendant would occasionally obtain reductions in parking penalties for friends and fellow officers through intercession by cooperative personnel in the Violations Bureau who would go before the sitting judge for this purpose.

Defendant's testimonial explanation of his coming into possession of the Colfax check, also in substance set forth in a statement by defendant to the prosecutor offered into evidence by the State, was as follows. One day around Christmas 1971 another patrolman, Lombardi, handed defendant four traffic tickets (two for parking offenses and two late notices) and a check for $30 payable to the Municipal Court, requesting defendant to "get a price" (reduction) on the tickets. Defendant approached Phillip Verga, a Violations Bureau employee (severed for trial, as noted above), who took the tickets and check. Several hours later Verga told defendant the fines had been reduced to a total of $23, and he handed over the $7 difference in cash. Defendant sent that money to Lombardi. Some time later, Verga told defendant that the check had "bounced" and returned it to him with a demand for satisfaction therefor. This turned out to be the Colfax check. Lombardi then supplied defendant with the Colfax address, and defendant thereupon dispatched co-defendant Kelly and Patrolman Binaski, who inferentially deemed themselves subject to his orders for routine errands, to the Colfax home with instructions to return the defaulted check to her and obtain a valid one in its place. As confirmed by the testimony of Binaski and Miss Colfax, this mission was accomplished. Miss Colfax was instructed that a warrant for her arrest would issue if she did not produce a new $30 check. In accordance with defendant's previous instructions, Binaski placed the replacement check, being for $30 and payable to Municipal Court, in an envelope, and deposited it in defendant's desk drawer. Coincidentally, Lombardi died that day, a fact defendant learned the next day.

Defendant testified he saw the check in his desk the next day. When Verga asked for it that afternoon defendant could not find it, but because "Phil had to balance his accounts" defendant took $30 in cash out of his own pocket and gave it to him. (Verga was not produced as a witness by either side).

Subsequently defendant discovered the missing check. He wanted to be reimbursed for the $30 he had advanced. Yet he felt he could not bring the check to Verga because "he would have thought something certainly wrong * * *"; he did not know Miss Colfax; and Lombardi was dead. So he endorsed a random name from a newspaper story, "Michael Arnold", on the back of the check and asked co-defendant Kelly to have it cashed at the nearby bar of an acquaintance, one Lupi, who had cashed personal checks for Kelly previously. Kelly brought the check to Lupi and asked him to cash it as a favor for defendant. When Lupi asked whether the check was "all right" Kelly told him that "Frank said don't worry about it, he'll take care of it." Thereupon Lupi cashed the check and stamped the endorsement "Bergen Bar" on its back. Kelly brought the defendant the money.[1] The check was apparently paid by the drawee bank.

The State proved that the back of the filed fire hydrant ticket ("white" copy) here involved bore notations indicating a guilty plea, a fine of three dollars and an endorsed handwritten initial "J", which ordinarily would signify that Municipal Judge Joseph S. E. Verga had fixed the fine. The judge testified, however, that neither the "J" nor the other notations on the ticket were in his handwriting. He further stated that only a judge can reduce or "downgrade" a stated penalty on a parking ticket; that such reductions

---

[1]The only substantial difference between defendant's testimonial account and his statement to the prosecutor was that in the latter he stated he personally cashed the check with Lupi. He explained he had not wanted to involve Kelly at that point of the investigation.

are sometimes granted on an appearance and extenuating explanation by one other than the offender; and that no one outside the staff of the Violations Bureau is ever permitted access to the filed or "white" copy of a ticket. The Violations Bureau and the Municipal Court judges process about 200,000 traffic tickets a year.

The Chief Violations Clerk of the Violations Bureau identified a register tape of fines paid into Municipal Court on January 10, 1972, which indicated that three dollars was paid as a court-ordered fine for the parking ticket here involved.

## I

We deal first with the State's objection to the acquittal ordered by the Appellate Division on the forgery count. The statute (*N. J. S. A.* 2A:109–1(a).) reads as follows:

> Any person who, with intent to prejudice, injure, damage or defraud any other person:
> a. Falsely makes, alters, forges or counterfeits any record or other authentic matter of a public nature or character, or any printed or written instrument or indorsement, acceptance, transfer or assignment thereof;
> * * * * * * * *
> Is guilty of a high misdemeanor.

The reasoning of the Appellate Division in reversing the conviction on the forgery count was the following:

> The statutory offense of forgery as it exists in this State is addressed to the "fraudulent making of a writing which if genuine would, or on its face might be, of some legal effect upon the rights of others * * *" *State v. Ruggiero,* 43 *N. J. Super.* 156, 159 (App. Div. 1956), aff'd o.b. 25 *N. J.* 292 (1957); *State v. Gledhill,* —— *N. J.* —— (dec. June 10, 1975) [67 *N. J.* 565, 572]. The gist of the offense is the creation of the appearance or illusion of genuineness. *State v. Berko,* 75 *N. J. Super.* 283, 290 (App. Div. 1962). Here the use of the fictitious name Michael Arnold was worthless. It did not have any legal effect upon the apparent negotiability of the instrument. The check itself was genuine; the endorsement of the fictitious name was an immaterial addition of no legal significance.

*Carr v. United States*, 278 *F*. 2d 702 (6 Cir. 1960). We deem of no significance the fact that the check for some unexplained reason was in fact paid by the drawee bank. In view of our holding we need not discuss defendant's arguments relating to the court's instructions to the jury on the subject of forgery.

 We believe the focus of the foregoing excerpt on the legal immateriality of the fictitious writing on the check unduly constricts the incriminating intent of the statute. In the *Ruggiero* case, quoted by the Appellate Division, Judge Jayne, in language adopted by this Court in affirming, went beyond the customary definitions of forgery as a false writing, made fraudulently, "which if genuine *would operate* as the foundation of another's liability or the evidence of his right." (emphasis added). 3 Underhill, *Criminal Evidence* (5th ed. 1957) § 770, p. 1769). *Cf. State v. Gledhill*, 67 *N. J.* 565, 572 (1975). The offense is committed, under *Ruggiero*, where the false writing "if genuine would, *or on its face might be*, of some legal effect upon the rights of others * * *" (emphasis added) (43 *N. J. Super.* at 159).

 It is our view, moreover, that the legislative intention, by the statutory revision of the common-law crime of forgery, was to protect laymen of all degrees of legal sophistication from the fraudulent making of a false or fictitious writing. The statute expressly proscribes the false *making* as well as *forging* of any written instrument or endorsement, if there is fraudulent intent. The inferential purpose of the present endorsement was to induce Mr. Lupi to accept and cash the check, and the jury might have found that defendant believed Lupi would be more likely to be willing to cash the Colfax check with a signature — any signature — on its back than without it. So viewed, we regard the defendant's intent and act as fairly within the protective orbit of the statutory policy. He is not excluded from the operation of the statutory proscription merely because the naked endorsed signature, "Michael Arnold", might not as a matter of law effect negotiability of a check made payable to Municipal Court. In fact many laymen negotiate and ac-

cept instruments with legally imperfect endorsements. Lupi, or one in his position, might well assume that the individual endorsement on a check made payable to the Municipal Court, and sought to be cashed by a police precinct clerk, known to him, was that of a person authorized to negotiate the check on behalf of the court.

As was said by the former Supreme Court well over a century ago: "The law of [forgery] is to protect the mass of society, and it matters not that a few knowing men are safe." *State v. Robinson and Chittenden*, 16 *N. J. L.* 507, 510 (Sup. Ct. 1838) (quoted in *Rohr v. State*, 60 *N. J. L.* 576, 582 (E. & A. 1897)).

As for the reliance by both the Appellate Division and defendant on the decision in *Carr v. United States*, 278 *F. 2d* 702 (6th Cir. 1960), the case appears to be on point. However, we are constrained to disagree with the case as it, like the opinion here under review, relies exclusively on the rationale that the forged endorsement in question "was *legally insufficient* to pass title to another person or to permit [the check] to be cashed by the holder". (emphasis added). *Id.* at 703. We have hereinabove indicated our conviction that such reasoning is in discordance with the language of our statute and the sweep of its public policy as we read it.

## II

On his appeal to the Appellate Division defendant argued he could not be guilty of forgery and that his motion for acquittal thereof should have been granted. The contention was that Lupi testified he never saw the endorsement on the back of the check and that he cashed it only because Kelly relayed defendant's assurance that the check was "all right" notwithstanding it was made payable to Municipal Court. In other words, there was no causal relation between the endorsement and the negotiation of the check nor any reliance upon the endorsement.

The point made is irrelevant. If the author of the false writing has fraudulent intent and if the writing is

false or fictitious and has *the capacity* to have been relied upon as legally significant, the crime is complete. It is not necessary that any person has in fact been deceived by the writing. See *State v. Jones*, 9 *N. J. L.* 357, 373 (Sup. Ct. 1828).

It is clear to us that the record is replete with evidence of defendant's fraudulent intent. The jury could legitimately have disbelieved all or much of his story as to how he came into possession of the first Colfax check and that he paid out $30 of his own funds. But even if the latter fact were credited, the proofs permit an inference that he intended to defraud either the City, Miss Colfax, one of the banks or Lupi when endorsing the check with the Arnold name. See *Rohr v. State, supra* (60 *N. J. L.* at 580).

### III

■ Defendant claims plain error in the failure of the trial court to explain to the jury the meaning of the phrase "material misrepresentation of fact" when instructing them that the false writing must have contained "some material misrepresentation of fact". In the light of the trial court's charge on forgery as a whole, we do not find the omission complained of to have possessed a clear capacity to bring about an unjust result. See *State v. Macon*, 57 *N. J.* 325, 333 (1971). The portion of the charge in question is merely another way of stating the rule requirement mentioned above, *i. e.*, that the false writing, if genuine, would, or on its face might be, of some legal effect upon the rights of others, etc. The substance of that rule was in fact contained in the court's charge, and the instruction was couched in language more favorable to the defendant than was properly warranted. Defendant could not have been harmed.

We find no plain error.

### IV

On the appeal to the Appellate Division defendant contended that his motion for acquittal on the charge of mis-

conduct in office should have been granted for the reason that the conduct of the defendant impugned was not shown to have been in the exercise of the duties of his office or while acting under color of his office.

█ The State responds to this position, in part, on the basis of the holding of this Court in *State v. Cohen*, 32 *N. J.* 1 (1960), to the effect that since every police officer has a duty not to commit crime, the violation of that duty is perforce misconduct in office. *Id. at* 9–10. However, the only *crime* of which defendant was here found guilty, aside from misconduct in office, was forgery. Clearly, the misconduct conviction cannot be made to rest on the behavior of defendant which grounded the conviction of forgery—else the defendant would be impermissibly penalized twice for what factually would be one act or transaction. *State v. Davis*, 68 *N. J.* 69, 77 (1975). Thus, the conviction for official misconduct cannot be sustained on the *Cohen* rationale.

We are consequently relegated to the inquiry whether defendant's conduct in respects other than the commission of the forgery is shown to have been both unlawful and sufficiently related to his office to constitute misconduct in office.

█ While this Court has approved the classic definition of misconduct in office as "corrupt misbehavior by an officer in the exercise of the duties of his office or while acting under color of his office", *State v. Begyn*, 34 *N. J.* 35, 49 (1961), we have made it clear that the word "corrupt" does not necessarily, in this sense, mean financial dishonesty. It rather connotes that the wrongful act was done "willfully" and "unlawfully". *Id.* at 50. The essence of the crime is that the impugned conduct is done with "evil motive or in bad faith and not honestly". *Id.* at 50. In accord: *State v. Williamson*, 54 *N. J. Super.* 170, 183–185 (App. Div.) aff'd o. b. 31 *N. J.* 16 (1959); and see *State v. Savoie*, 67 *N. J.* 439, 461–462 n. 7 (1975). It would be preferable if in-

dictments and jury charges in this area used the latter language rather than the misleading "corrupt" or "corruptly".

In charging the jury the trial court brought their attention to the specifications of official misconduct in the pertinent count of the indictment — count 5: (1) tendering the first Colfax check to Phillip Verga in return for $30; (2) directing Kelly and Binaski to pick up the second Colfax check; (3) endorsing the second Colfax check and causing it to be cashed; (4) conspiring with Verga and Kelly to obtain "$27–$30" not due to them. Of these, item (1) was not proved; the endorsement of the second Colfax check (item 3) is the basis of the forgery conviction; and the defendant was acquitted of the conspiracy represented by item (4). This leaves the picking up and the cashing of the second Colfax check as the remaining viable constituents of the charge of official misconduct leveled by the indictment against defendant.

We regard the arrangements by defendant for the last stated transactions as well within the scope of action "under color of office". The jury was free to find that the compliance of Kelly and Binaski with defendant's request of them to exchange the rejected check for the new check of Miss Colfax was based upon their recognition of his standing as a police officer and precinct clerk and his *de facto* authority to send them on such an errand. The same applies to Kelly's acceptance of defendant's directive to get the check cashed. The conceded circumstance that defendant's duties and authority did not in fact extend to such activities is not controlling on the question of whether they were done under color of office. But that fact does enter into the question of whether such acts were unlawful and performed "in bad faith and not honestly". *State v. Begyn, supra* (34 *N. J.* at 50). The latter question was a proper jury issue here, and we are clear that the evidence abundantly permitted an affirmative finding on the issue of culpability.

## V

Among his contentions before the Appellate Division defendant urged that the trial court's charge to the jury equated his guilt on the official misconduct charge with the charge that he "obtained moneys of Jersey City"; and that since the jury acquitted defendant of count 2 — unlawfully obtaining money of Jersey City — he could not consistently be found guilty of official misconduct.

The argument understates the scope of the court's instructions to the jury as to the nature of the official misconduct charge. As indicated above, the Court explained to the jury that the State's position in this regard extended to the defendant's procurement of the exchange of the two Colfax checks and of the cashing of the second one. It was immaterial to those charges whether the money involved was that of Jersey City, Miss Colfax, Mr. Lupi, or the drawee bank. Therefore the instructions to the jury, taken in entirety, cannot fairly be said to have been understood by the jury to render defendant's guilt of official misconduct dependent on a finding by them that the $30 realized by defendant was "moneys of Jersey City".

The jury here could have decided to acquit defendant on count 2 because not satisfied beyond a reasonable doubt that the moneys in question belonged to Jersey City, yet entirely consistently found defendant guilty of misconduct in office without regard for the matter of whose money was represented by the Colfax check.

The judgment of the Appellate Division is modified by setting aside its reversal of the conviction for forgery and by reinstating that conviction. In all other respects the judgment is affirmed.

*For modification and affirmance*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN CLIFFORD and SCHREIBER and Judge CONFORD—7.

*For reversal*—None.