THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. LOUIS S. SMITH, HERBERT E. CALLENDER, MARVA
L. AMIS, LILY R. LEWIS, WILLARD D. CRITTENDON,
JOYCE L. SCHURIC, DEFENDANTS-APPELLANTS.

Argued December 21, 1965—Decided March 21, 1966.

512

*Mr. Carl Rachlin,* of the New York bar, argued the cause for appellants (*Mr. Stephen M. Nagler* and *Mr. George Schiffer,* of counsel; *Mr. David I. Fox,* attorney).

*Mr. Edward J. Phelan,* Assistant Prosecutor, argued the cause for respondent (*Mr. Vincent Panaro,* Mercer County prosecutor, attorney).

The opinion of the court was delivered by

WEINTRAUB, C. J. The six defendants were convicted in the Municipal Court of the City of Trenton of violating two sections of the Disorderly Persons Act. On a trial *de novo* in the Mercer County Court, defendant Callender was again convicted on both counts and fined $100 as to each. The remaining defendants were found guilty of only one of the two charges and each was fined $100. We certified defendants' appeals before argument in the Appellate Division.

The setting of these offenses was a public meeting of the governing body of the City of Trenton held at the council chamber and called to consider an urban redevelopment program. While a citizen was speaking against the proposal, there was a disturbance in the area in which defendant Callender was seated. This was the second such distraction from that direction. The president of the City Council called for quiet so that speakers might be heard and warned "that if there were not silence we would have to ask them to leave or ask them to be removed by the sergeant-at-arms." According to the State's proof, Callender retorted "We haven't started to disrupt your meeting yet," or "We have not begun to interrupt your meeting yet." According to the defense, he said "We haven't done anything yet." These versions really differ very little since under each the word "yet" could carry the promise or threat that the disturbances would be repeated and in greater volume. So understanding Callender, the president of the Council directed a police officer to escort him from the room.

The disturbance just described was not the basis of the conviction. Rather the basis was Callender's resistance to the efforts to remove him. He locked arms with someone seated next to him and went limp. Two police officers, in the words of a witness, "had a little problem in lifting him because he's a pretty big boy," and "As they got him out of the seat he sort of fell to the floor or slid to the floor and just laid there for a moment or two, or maybe ten or fifteen seconds, and then one officer took him by his feet and the other took him by his arms and they sort of half dragged and half carried him out of the meeting chamber and deposited him in the corridor or the entrance into the chamber." While Callender was thus being removed, persons near him chanted "Freedom." The president of the Council asked the speaker then on the floor to talk more loudly to overcome the distraction and according to one witness the speaker in fact said nothing during the commotion. Upon those facts the county court

found Callender guilty of violating *N. J. S.* 2A:170–28 which reads:

"Any person who by noisy or disorderly conduct disturbs or interferes with the quiet or good order of any place of assembly, public or private, including schools, churches, libraries and reading rooms, is a disorderly person."

As stated above, Callender was carried into the corridor just beyond the door to the chamber, and still limp, he was lowered to the floor. Callender stretched out his legs, and the five codefendants seated themselves on the floor in a semi-circle, arms and legs interlocked or intertwined. We gather they were carried away before the public meeting ended. Out of this setting stemmed the conviction of all defendants under *N. J. S.* 2A:170–29 which denounces as a disorderly person:

"Any person who in any place, public or private, * * *
b. Obstructs, molests or interferes with any person lawfully therein;
* * *."

The factual picture will be enlarged below.

## I.

Defendant Callender contends his conviction under *N. J. S.* 2A:170–28 is against the weight of the evidence. We see no basis to interfere with the trial court's findings. The testimony well warranted a finding that Callender's resistance to the efforts to remove him from the chamber was disorderly, and that that conduct, with the noise necessarily generated by the mode of removal to which Callender put the police officers, did disturb the quiet and good order within the chamber.

Callender's point seems to be that his conduct could not be found to disturb or interfere with the quiet or good order of the meeting because he was "wholly passive." It toys with words thus to describe his behavior. Rather he resisted re-

moval in affirmative terms, both in locking arms with another and in confronting the officers with his dead weight. And it is idle to say, as does defendant, that "the crucial element of intention to disturb is consequently totally lacking." The normal inference is that he intended precisely what he accomplished.

■ Defendant says the statute does not apply because the phrase "place of assembly, public or private, including schools, churches, libraries and reading rooms" does not include the public meeting room of a city council. He contends the word "including" limits "place of assembly" to places which are like a school or a church or a library or a reading room, and says the council chamber resembles none of them.

Prior to the adoption of this provision by the revision of Title 2, effective January 1, 1952, the disorderly persons statute spoke specifically of, and only of, "a public school," *R. S.* 2:202–12; a place of worship, *R. S.* 2:210–1; and "a public library or reading room," *R. S.* 2:202–11. The revision of 1952 deliberately expanded the area of protection to "any place of assembly," whether "public or private." The specification after the word "including" was not intended to restrain the general words preceding it. See generally *Cuna v. Board of Fire Com'rs, Avenel,* 42 *N. J.* 292, 304–305 (1964). Indeed, if "including" had that effect, the specifics would likely exhaust the general words since it is difficult to think of a place which is like, but is not, a school or a church or a library or a reading room. Rather the draftsman specified those four places to avoid any question as to whether they continued to be protected and perhaps also to make it clear that, whereas under the prior statutes the protected schools, libraries and reading rooms were "public" ones, the revision protected "private" ones as well.

Nor can we distill from the places thus specified some characteristic levels of noise and other conduct, and use those levels as an index to places covered by the statute. For one thing, to read the statute to mean that it applies only to a place of assembly wherein the tolerable noise level and toler-

able behavior are those expected in a school or a church or a library or a reading room would probably render the general words too vague to survive a constitutional challenge as to them under the due process clause. In any event we see no reason to deny to "any place of assembly, public or private" the natural meaning of those words. Surely, to come to the facts of this case, it should surprise no one that misbehavior disruptive of a hearing before a city council runs afoul of some punitive law, and surely a man of modest understanding, had he consulted the statute in advance of the meeting, would not doubt that it covered the place and the occasion.

Next, defendant addresses sundry constitutional attacks upon the statute and upon its application to his conduct. We see no substance in any of them.

Running throughout defendant's position is the claim that his behavior was protected by the First Amendment to the United States Constitution, for which he cites *Garner v. State of Louisiana*, 368 *U. S.* 157, 167, 82 *S. Ct.* 248, 7 *L. Ed.* 2d 207 (1961); *Edwards v. South Carolina*, 372 *U. S.* 229, 83 *S. Ct.* 680, 9 *L. Ed.* 2d 697 (1963); *Henry v. City of Rock Hill*, 376 *U. S.* 776, 84 *S. Ct.* 1042, 12 *L. Ed.* 2d 79 (1964); *Cox v. State of Louisiana*, 379 *U. S.* 536, 85 *S. Ct.* 453, 13 *L. Ed.* 2d 471 (1965); and *Cox v. State of Louisiana*, 379 *U. S.* 559, 85 *S. Ct.* 476, 13 *L. Ed.* 2d 487 (1965). Those cases involved peaceful protests against discrimination because of race, the settings being private places of public service such as lunch counters or public places such as a street or an area in front of a city hall. None remotely resembles the case before us.

▮ Here there was no denial of an opportunity to protest. On the contrary the meeting was called to the very end of permitting all to have their say, for or against the urban redevelopment proposal. Callender was not denied a chance to be heard. Rather he was denied a right he seemingly claimed to interfere with the right of others to hear and be heard. He was not ordered removed because he expressed views which displeased the presiding officer. He was ordered

out because, in response to the president's call for quiet, he threatened even greater disruption of this public meeting. Whether the forum be the courtroom or the chamber of the legislature itself or of a political subdivision of the State, there must be order. It is frivolous to suggest the First Amendment stands in the way of that imperative.

■ Nor is there substance to Callender's proposition that he had a right to resist removal from the chamber in order to test the validity of the order that he leave. In fact, if such a right were recognized, it would not aid him since the record amply justifies the belief of the president of the Council that defendant intended to interfere with the good order of the hearing. But the more fundamental answer is that the decision of the presiding officer cannot be tested by physical resistance. The remedy, if there is one, must lie elsewhere. Government could not govern if its vital processes could thus be brought to halt. Again, no court would tolerate such interference with its proceedings; the need is the same in the legislative chamber, at the State and at the local level. The chair must have the power to suppress a disturbance or the threat of one, and the power to quell a disturbance would be empty if its exercise could be met by still another disturbance designed to test the officer's judgment.

Although, as we have said, none of the cases cited above factually touch the situation before us, it is plain that *Cox v. State of Louisiana* rejects the notion that lawlessness may pass in the garb of a constitutional guarantee. The majority opinion reminds us (379 *U. S.,* at *p.* 554, 85 *S. Ct.,* at *p.* 464, 13 *L. Ed. 2d,* at *p.* 484) :

"From these decisions certain clear principles emerge. The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty would be lost in the excesses of anarchy. The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote

the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection. One would not be justified in ignoring the familiar red light because this was thought to be a means of social protest. Nor could one, contrary to traffic regulations, insist upon a street meeting in the middle of Times Square at the rush hour as a form of freedom of speech or assembly. Governmental authorities have the duty and responsibility to keep their streets open and available for movement. A group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations. * * *

We emphatically reject the notion urged by appellant that the First and Fourteenth Amendments afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford to those who communicate ideas by pure speech. * * * We reaffirm the statement of the Court in Giboney v. Empire Storage & Ice Co., supra, 336 U. S. [490], at 502, 69 S. Ct. [684], at 691, [93 L. Ed. 834, at 843] that 'it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.' "

Finally defendant says the statute is void for vagueness because it does not spell out the degree of noise or the details of a disorder which will offend. Of course, the statute does not do so in specific terms, and it may be doubted that the ingenuity of man could meet that demand if the Constitution made it. But the Constitution does not insist upon the impossible. It asks only what the subject will reasonably permit, and hence if there is a public interest in need of protection, due process does not stand in the way merely because the subject defies minute prescription.

The basic principle is that a statute is bad if it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application," Connally v. General Construction Co., 269 U. S. 385, 391, 46 S. Ct. 126, 127, 70 L. Ed. 322, 328 (1926). As that case points out, the subject matter itself may give adequate content to words which, considered alone, may seem forbiddenly obscure. Moreover, if

the subject is such that greater specificity is not feasible, we must remember, as was said in *Boyce Motor Lines, Inc. v. United States,* 342 *U. S.* 337, 340, 72 *S. Ct.* 329, 331, 96 *L. Ed.* 367, 371 (1952), that:

"* * * But few words possess the precision of mathematical symbols, most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions. Consequently, no more than a reasonable degree of certainty can be demanded. Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line."

Hence it would not necessarily "be fatal if incongruities or problems of construction should develop in fringe areas." *State v. Monteleone,* 36 *N. J.* 93, 98 (1961). In such circumstances, the courts can see to it that a statute is not applied beyond a fair understanding of the legislative intent.

The statute before us meets the constitutional demand. It speaks of "noisy or disorderly conduct" which "disturbs or interferes with the quiet or good order" of "any place of assembly, public or private." Surely, a man of ordinary intelligence knows the council chamber at the time of a public hearing is a public "place of assembly." So, too, such a man knows the "quiet or good order" of a place depends upon the nature and the purpose and the needs of the meeting. He also knows a legislative chamber from a barroom or a ball park and knows what kind of behavior comports with each.

Hence the statute is valid on its face. It is also valid as applied in this case. For a man to refuse to leave upon the order of the president of the Council, to resist removal by locking arms with another and requiring two officers to carry and drag him from the chamber, is clearly foreign to the nature and purpose of the assembly, and the actor should not be surprised by a decision that his conduct was "disorderly" and did disturb and interfere with both the "quiet" and "the good order" of that meeting.

## II.

■ All defendants contend their convictions under *N. J. S.* 2A:170–29 for obstructing or interfering with persons lawfully in a public place, were against the weight of the evidence. We are satisfied they were not.

The testimony was conflicting. For the State the testimony showed a double door, each section three feet in width, separated the corridor from the council chamber; that defendants so arranged themselves that one door could not be opened at all; and that while the other could be opened partially, a person could pass only with difficulty, either by stepping over defendants or squeezing around them. Defendants testified that the few persons who passed did so easily. Callender added a claim that when he attempted to rise, a police officer prevented him, while the State's testimony was firm that both Callender, notwithstanding his behavior in the council chamber, and the other defendants were asked to leave but declined so much as to answer. The issue was one of credibility, and since the County Court had the advantage of seeing and hearing the witnesses, we should not reject findings which are well supported in the written record.

■ It does not matter that persons managed to get by or that none was delayed for anything beyond a minute. The statute does not require that the obstruction or interference be complete or enduring. The word "obstruct" includes hindering, *State v. Furino*, 85 *N. J. Super.* 345, 348 (*App. Div.* 1964), and of course "interfere" does not require a total frustration. It is enough that defendants immobilized themselves at a place designed for passage, and did so for the purpose, as their attitude of immobility strongly suggested, and with the effect of making it difficult for others to use the corridor in going in and out of the council chamber.

Defendants cannot find help in *People v. Nixson*, 248 *N. Y.* 182, 161 *N. E.* 463 (*Ct. App.* 1928), where, as the court said, "The sole question is whether a number of pedestrians walking, quietly, four abreast, on the sidewalk, creating no ex-

citement, or disturbance, may without warning by the police be arrested for disorderly conduct and sentenced to a term of imprisonment" (161 *N. E.*, at *p.* 466). Indeed the court there affirmed the conviction in four cases in which the defendants failed to heed the warning of the police to cease marching in large groups where the police feared the possibility of disorder (161 *N. E.*, at *p.* 466). In the case on hand, defendants were not merely standing in the corridor with no intent to block it. Rather defendants intentionally obstructed the passageway, assuming positions of immobility from which those who would want to pass would know defendants would not budge.

Defendants further urge that despite the unity of action and purpose with which they arranged themselves on the floor, the guilt of each must be judged severally upon an inquiry as to whether he or she alone obstructed or interfered with passage. The proposition is frivolous.

Defendants say the statute is invalid on its face because it does not require proof of a breach of the peace. We do not understand the police power to be so limited. In any event the statute proscribes conduct which holds the promise of a disorder of that kind, and we have no doubt the State may deal with it punitively on that account.

Finally defendants say the statute is invalid as applied to the facts of this case. That contention largely depends upon factual assertions which the trial court did not believe. Beyond that, defendants seem to be repeating the broad proposition we rejected in "I" above, that they have a constitutional right to express their grievances in the way they think meet, here by sitting at a place intended for walking and to do so in a manner which interferes with others who want to pass. The right to protest does not include a right to disregard statutes reasonably designed to protect the rights of all. If the grievance at that point was, as it seems, the removal of Callender from the council chamber, surely the Constitution does not accord to all who

disagree with the order of the presiding officer, a right to stretch out across the entrance to the forum.

The judgments are affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR and HALL—5.

*For reversal*—None.