STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
HARVEY I. LASHINSKY, DEFENDANT-APPELLANT.

Argued April 3, 1979—Decided July 23, 1979.

(1)

4 

*Mr. Donald A. Robinson* argued the cause for appellant (*Messrs. Robinson, Wayne & Greenberg,* attorneys; *Messrs. Sabin, Bermant & Blau,* of the New York Bar, of counsel; *Mr. Robinson, Mr. Nicholas L. Ribis* and *Mr. John B. Livelli,* on the briefs).

*Mr. Robert E. Rochford,* Deputy Attorney General, argued the cause for respondent (*Mr. John J. Degnan,* Attorney General of New Jersey, attorney; *Mr. John J. DeCicco, Mr. George Ciszak, Mr. Rochford* and *Ms. Debra L. Stone,* Deputy Attorneys General, of counsel; *Mr. Stephen H. Monson, Mr. Rochford* and *Ms. Stone,* Deputy Attorneys General, on the briefs).

*Mr. Arthur J. Lesemann* submitted a brief on behalf of *amicus curiae* The Associated Press (*Messrs. Mazer, Lesemann & Rupp,* attorneys).

The opinion of the court was delivered by

HANDLER, J.

The question before the Court in this case is whether the defendant, Harvey I. Lashinsky, a press photographer employed by a newspaper, The Star-Ledger, was properly convicted as a disorderly person for his refusal to heed a police officer's order

to move back from the immediate vicinity of a gory, fatal automobile accident on the Garden State Parkway. Lashinsky was charged with violating *N.J.S.A.* 2A:170–29(2)(b) which provides that: "Any person who in any place, public or private * * obstructs, molests or interferes with any person lawfully therein * * * is a disorderly person." On May 16, 1978, after a three day trial before the Sayreville Municipal Court, defendant was adjudged guilty and fined $25 plus court costs. On June 9, 1978 the Middlesex County Court conducted a trial *de novo* on the record and sustained the conviction but reduced defendant's fine to $10 and court costs to $5. We granted direct certification on January 9, 1979, 79 *N.J.* 475, and now affirm.

The events giving rise to defendant's arrest began at about 1:45 p. m. on March 25, 1977 when Lashinsky, driving south along the Parkway, noticed a broken guardrail and a car overturned on a sloped embankment on the shoulder of the road. Believing that the accident was a "spot news event" worthy of coverage, defendant parked his car about 150 feet away, placed his press pass identification in the windshield, proceeded toward the wreckage and took several pictures.

About fifteen or twenty minutes later Trooper Eric Herkloz of the New Jersey State Police arrived. By this time a crowd of about forty or fifty people had gathered in the vicinity of the accident. A member of the Herbertsville First Aid Squad who had stopped to provide help advised the officer that there were casualties. A girl, seriously injured, covered with blood and going into shock, was pinned inside the automobile against the corpse of her mother, who had been decapitated. Herkloz went back to his patrol car and radioed for an ambulance and police "back-up" units. Upon returning to the area of the wreck, the officer noticed that gas, oil and transmission fluid were leaking from the vehicle and that the car's battery, although still attached to the electrical system, had fallen from the car and cracked open. In addition a great deal of personal property was

strewn about the crash site.[1] Fearing that a fire might break
out which would jeopardize the safety of the injured victim,
those attending her and the numerous onlookers, and cognizant
of standard police procedures which require that the scene of a
traffic fatality be preserved for investigation, Herkloz decided
to clear the area of spectators. Everyone, except two individu-
als involved in first aid, was asked to withdraw from the area
until the police back-up assistance arrived. About fifteen or
twenty spectators, including the defendant, failed to comply
with the request immediately. Herkloz turned his attention
alternately between Lashinsky, who was positioned down the
embankment where the wreck had come to rest, and members of
the crowd, who had begun to proceed up the slope. Lashinsky
was asked, individually, to "please leave the scene". The pho-
tographer stepped back five feet but withdrew no farther.
Lashinsky showed Herkloz a press card issued by the State
Police. The trooper told Lashinsky "I don't care at this point"
and again asked him to "please leave the scene". Defendant
claimed at trial that Herkloz then arrested him immediately,
before he had a chance to respond. However, the trooper and
the two first aid assistants testified that prior to the arrest,
Lashinsky engaged the trooper in a heated argument, lasting
about three to four minutes, during which Lashinsky hurled
expletives at Herkloz and told the officer to go away and do his
own job and let Lashinsky do his. After it became quite
apparent that the photographer had no intention of removing
himself from the scene, he was arrested.

Although it is undisputed that Lashinsky never actually
touched or threatened the officer, there is ample evidence from
which to conclude that the defendant impeded the trooper in the
performance of his duties. The County Court Judge found that
the size of the crowd at the accident scene made it very difficult

---

[1]Among the personal property found at the scene were $15,000 in currency
and $10,000 worth of negotiable checks. These items were not found,
however, until after the defendant had been arrested.

for a lone policeman to exercise control. Herkloz testified that, during the argument, other spectators, who had begun leaving the scene, "stopped * * * and turned around and paid attention to the defendant who was screaming at [the trooper] * * * ". The officer added that, had it not been for the altercation with Lashinsky, he would have spent that time giving first aid to the victim still inside the vehicle and assisting the person already providing first aid, who herself testified that she had wanted to obtain help from the officer but had been unable to secure his attention because he had his back to her and was busy arguing with Lashinsky.

To complete the factual picture, it should be noted that some time *after* Lashinsky was arrested, two other photographers, one from the New Jersey Highway Authority (which operates the Garden State Parkway) and one from the State Police, arrived and, since they had official duties, were permitted by Herkloz to take pictures. The trooper testified that he had allowed one of these men to stay, because "[h]e [was] supposed to be out there to take pictures of the accident * * * . It was the man's job."

Two important related questions emerge from defendant's primary contention that his conduct was not proscribed by the disorderly persons statute, *N.J.S.A.* 2A:170–29(2)(b). One involves the assertion that his conduct simply was not the kind of activity which the statute intended to forbid as a disorderly persons offense. The other is that his status as a newspaperman, a press photographer, was in a sense privileged and constituted a defense to the disorderly persons charge. Defendant also contends that the statute under which he was convicted was unconstitutionally vague and overbroad. We deal with each of these issues.

## I

Defendant argues that his conduct should not be considered to have violated the disorderly persons statute because he did not directly, physically interfere with the officer's movement and

because he did not have the specific intent to interfere with the officer.[2] His offered interpretation of the statute, which would exempt his actions, is overly narrow.

■ This statute, which forbids an individual to obstruct, molest or interfere with another person who is lawfully in any place, *N.J.S.A.* 2A:170–29(2)(b), does not by its express terms import the notion that the prohibited conduct must be physical in nature. Obviously, conduct involving direct contact which physically obstructs or restrains the lawful activities of another individual, see, *e. g., Haywood v. Ryan,* 85 *N.J.L.* 116, 118–119 (Sup.Ct.1913); *State v. Guillotte,* 10 *N.J.Super.* 502, 503 (Cty.Ct. 1950), would constitute a ready example of the statute's application. It does not follow, however, that the outer limits of the statutory prohibition is restricted to such physical interference and nothing more. The court in *State v. Furino,* 85 *N.J.Super.* 345, 348 (App.Div.1964), holding that the statute would prohibit conduct which impedes the task of a police officer, observed:

> The three verbs are definite, clear and distinct, readily understood and employed in the every-day speech of the man on the street. Refined definition is unnecessary. "Obstruct" means to object or come in the way of; to hinder from action; to impede. "Molest" means to interfere with or meddle with unwarrantably. And "interfere" is defined as to enter into or take a part in the concern of others; to intermeddle, intervene. *Webster's New International Dictionary,* (2d ed. 1948); and see 3 *Wharton's Criminal Law* (Anderson ed. 1957) § 1284, p. 634.

Accord, *State v. Manning,* 146 *N.J.Super.* 589, 593 (App.Div. 1977); see *State v. Smith,* 46 *N.J.* 510, 520, *cert.* den. 385 *U.S.* 838, 87 *S.Ct.* 85, 17 *L.Ed.*2d 71 (1966); *State v. Taylor,* 121 *N.J.Super.* 395, 398 (Cty.Dist.Ct.1972). A number of cases have held that interference does not require actual or total physical

---

[2]This Court expressly rejected the utility of the specific intent/general intent distinction in *State v. Atkins,* 78 *N.J.* 454 (1979) and *State v. Stasio,* 78 *N.J.* 467 (1979). We will, therefore, treat defendant as arguing that he did not "purposely" or "knowingly" intend to interfere with the officer. See *N.J.S.A.* 2C:2–2(b)(1), (2) (effective September 1, 1979).

frustration, *State v. Smith, supra; Tp. of East Brunswick v. Malfitano,* 108 *N.J.Super.* 244, 246–247 (App.Div.1970); *State v. Taylor,* 38 *N.J.Super.* 6, 29–30 (App.Div.1955); it may include conduct which involves unwarranted intervening or intermeddling in the activities of others, *State v. Manning, supra.*

A real concern expressed by those who believe the statute is limited to "physical interference with personal movement", *e. g., id.* 146 *N.J.Super.* at 598 (Antell, J., dissenting), is that, otherwise, an arresting officer could act arbitrarily to "convert the character of an event from nonpunishable to punishable by proclamation alone." *Id.* at 599. However, as the majority in *State v. Manning, supra,* perceptively noted, *id.* at 595, simply to say that a police officer by his command or "proclamation" may, in a given situation, define what conduct is or is not permissible, begs the ultimate question whether, as a matter of law, that conduct constituted "interference" and was properly prosecuted. This question in each case calls for an assessment of defendant's actions in light of *all* the surrounding circumstances—the activity giving rise to a policeman's order, the reasonableness of that order itself and the defendant's reaction to it. An individual may not, in our view, be arrested for disorderly conduct solely because the arresting officer capriciously or in bad faith finds behavior annoying or distracting. To trigger the application of the statute, conduct must be truly obstructive.

Courts are attuned to gauge the reasonableness of a policeman's actions in citizen-police confrontations and to sort out police behavior which is lawful and proper from that which is not. *E. g., Adams v. Williams,* 407 *U.S.* 143, 146, 92 *S.Ct.* 1921, 1923, 32 *L.Ed.2d* 612, 617 (1972); *Terry v. Ohio,* 392 *U.S.* 1, 20–27, 88 *S.Ct.* 1868, 1879–1883, 20 *L.Ed.2d* 889, 905–909 (1968); *State in Interest of H. B.,* 75 *N.J.* 243, 248 (1977) (stop-and-frisk cases); *State v. Washington,* 57 *N.J.* 160, 162–163 (1970); *State v. Mulvihill,* 57 *N.J.* 151, 155–159 (1970); *State v. Moriarty,* 133

N.J.Super. 563, 573–575 (App.Div.1975), certif. den. 68 *N.J.* 172 (1975) (resisting arrest cases). Judge Goldmann observed that " * * * [t]he duty of police officers, * * * , is 'not merely to arrest offenders, but to protect persons from threatened wrong and to prevent disorder. In the performance of their duties they may give reasonable directions' ". *State v. Taylor, supra,* 38 *N.J.Super.* at 30, quoting from *People v. Nixon,* 248 *N.Y.* 182, 188, 161 *N.E.* 464, 466 (Ct.App.1928) and *People v. Galpern,* 259 *N.Y.* 279, 181 *N.E.* 572 (Ct.App.1932); accord, *State v. Manning, supra,* 146 *N.J.Super.* at 596, 370 *A.2d* 499. The average citizen is, likewise, held to a similar standard and deemed capable of differentiating between permissible and impermissible behavior. Reasonableness is the key. Hence, where an officer's instructions are obviously reasonable, in furtherance of his duties, an individual toward whom such instructions are directed has a correlative duty to obey them. *State v. Taylor, supra.* If his refusal to respond results in an obstruction of the performance of the officer's proper tasks, this will constitute a violation of the disorderly persons statute.

We are not persuaded by defendant's argument that his conduct should not fall within the statute because he did not specifically intend to interfere with the officer. No such specific intent, in the sense of awareness of unlawfulness or a motive to break the law, is required in order to affix criminal responsibility for conduct which is otherwise volitional and purposeful, and in fact brings about the impermissible result. *Cf. State v. Schultz,* 71 *N.J.* 590, 601 (1976); *State v. Savoie,* 67 *N.J.* 439, 452–464 (1975); *Morss v. Forbes,* 24 *N.J.* 341, 358–359 (1957). Legitimate concerns for the public safety dictate that, in an emergency situation such as that presented here, it is the officer vested with public authority rather than a civilian bystander who must define what conduct is to be allowed. "Failure, even though conscientious, to obey directions of a police officer, not exceeding his authority, may interfere with the public order and

lead to a breach of the peace." *State v. Taylor, supra,* 38 *N.J.Super.* at 30; accord, *State v. Manning, supra; cf. Cox v. Louisiana,* 379 *U.S.* 559, 569, 85 *S.Ct.* 476, 483, 13 *L.Ed.*2d 487, 495 (1965).

The record supports the findings beyond a reasonable doubt of both trial courts that interference occurred in this case. An average person would readily understand the nature of the emergency confronting Officer Herkloz. The gravity of the accident, in which one of the victims was still alive, but possibly succumbing, made it imperative to clear the area for additional ambulance and police assistance. The possibility that fire might break out was another obvious reason for ordering the dispersal. General law enforcement responsibilities, heightened by the presence of personal property and valuables strewn about, made the officer's concern for preserving the scene of the accident apparent. The problems of crowd control faced by Herkloz, the only police officer there, anxiously awaiting assistance, were real, substantial, obvious and exigent. Defendant's presence at the scene at that time, taking pictures in close proximity to the victims and the car wreck, could not help but to attract the crowd's attention and make the officer's job more difficult. His order to Lashinsky to withdraw was clearly reasonable. Lashinsky's dogged and willful refusal to obey that order was palpably unreasonable. Under these circumstances, we have little difficulty in concluding that defendant was a disorderly person within the meaning of *N.J.S.A.* 2A:170–29(2)(b).[3]

---

[3]We note the somewhat different treatment accorded this kind of conduct under the New Jersey Code of Criminal Justice, *N.J.S.A.* 2C:33–7(b), *viz*:

b. A person in a gathering commits a petty disorderly persons offense if he refuses to obey a reasonable official request or order to move:
(1) To prevent obstruction of a highway or other public passage; or
(2) To maintain public safety by dispersing those gathered in dangerous proximity to a fire or other hazard.

## II

Defendant asserts that the disorderly persons statute does not in these circumstances reach him by virtue of his status as a member of the press. We disagree.

We have declared that the right of the press to gather news is entitled to special constitutional protection. *In re Farber*, 78 *N.J.* 259, 267 (1978); *Freedman v. New Jersey State Police*, 135 *N.J.Super.* 297, 302 (Law Div.1975). See *State v. Allen*, 73 *N.J.* 132, 170 (1977) (Schreiber, J., concurring). The Supreme Court has observed that "newsgathering is not without its First Amendment protections", for "without some protection for seeking out the news, freedom of the press could be eviscerated". *Branzburg v. Hayes*, 408 *U.S.* 665, 681, 707, 92 *S.Ct.* 2646, 2656, 2670, 33 *L.Ed.2d* 626, 639, 655 (1972); also, *Pell v. Procunier*, 417 *U.S.* 817, 833, 94 *S.Ct.* 2800, 2809, 41 *L.Ed.2d* 495, 507 (1974). Nevertheless, it has been recognized that the constitutional prerogatives of the press must yield, under appropriate circumstances, to other important and legitimate government interests. *Cf. In re Farber, supra*, 78 *N.J.* at 267–269. The liberty which the press seeks to assure our people can be meaningfully enjoyed only in a society where there is an adequate measure of order. *Cf. Cox v. Louisiana*, 379 *U.S.* 536, 554–555, 85 *S.Ct.* 453, 464, 13 *L.Ed.2d* 471, 484 (1965); *State v. Smith, supra*, 46 *N.J.* at 517–518. Consequently, "reasonable 'time, place and manner' regulations * * *'" may be imposed by the State on First Amendment freedoms. *Pell v. Procunier, supra*, 417 *U.S.* at 826, 94 *S.Ct.* at 2806, 41 *L.Ed.2d* at 504; *Cox v. New Hampshire*, 312 *U.S.* 569, 575–576, 61 *S.Ct.* 762, 766, 85 *L.Ed.* 1049, 1053–1054 (1941). See *Cox v. Louisiana, supra*, 379 *U.S.* at 554–555, 88 *S.Ct.* at 464, 13 *L.Ed.2d* at 484.

An order to move, addressed to a person whose speech or other lawful behavior attracts an obstructing audience, shall not be deemed reasonable if the obstruction can be readily remedied by police control of the size or location of the gathering.

The limitations which may reasonably be appended to a newsman's constitutional prerogatives must take into account the unique role of the press in public life. Restrictions which fail to give proper weight to the importance of the news and those who gather it and which are not necessary to accommodate any other legitimate governmental concerns would have no justification. *Cf. Branzburg v. Hayes, supra,* 408 *U.S.* at 707–708, 92 *S.Ct.* at 2670, 33 *L.Ed.*2d at 655. A news journalist or photographer on assignment acquires news "not * * * [only] for his own edification" but also to serve the needs of society. *Houchins v. KQED, Inc.,* 438 *U.S.* 1, 17, 98 *S.Ct.* 2588, 2598, 57 *L.Ed.*2d 553, 566 (1978) (Stewart, J., concurring). See *Gannett Co., Inc. v. DePasquale,* —— *U.S.* ——, ——, 99 *S.Ct.* 2898, 61 *L.Ed.*2d 608 (1979) (Powell, J., concurring); *Saxbe v. Washington Post Co.,* 417 *U.S.* 843, 863, 94 *S.Ct.* 2811, 2821, 41 *L.Ed.*2d 514, 527 (1974) (Powell, J., dissenting). A majority of the voting members of the Court in *Houchins v. KQED, Inc., supra,* recognized the First Amendment's concern that the public be optimally informed could in some instances render unreasonable restraints upon the scope of access to members of the press even where it would not be unreasonable to exclude the general public. *Id.,* (Stewart. J., concurring); 438 *U.S.* at 30–35, 98 *S.Ct.* at 2605–2607, 57 *L.Ed.* 2d at 575–577, (Stevens, J., dissenting). "In this perspective the reporter stands apart from the ordinary citizen." *In re Farber, supra,* 78 *N.J.* at 300, (Handler, J., dissenting).

■ In this framework, a balancing of competing values is required in order to assess the reasonableness of a criminal statute or governmental sanction as applied to a member of the press engaged in his profession. The Constitution does not serve to place the media or their representatives above the law. They are subject to law, as any citizen. The converse proposition would be intolerable. But, the status of an individual as a newsperson seeking news is a weighty factor in the equation for applying the law's strictures. In the present context, whether a

newsperson's conduct is disorderly must turn on whether, from an objective standpoint and under all of the circumstances, the policeman's order to the newsman was reasonable, taking into account the special role performed by the press. An officer should, if made aware of the identity and status of an individual as a newsperson engaged in gathering news, be mindful that such an individual has a legitimate and proper reason to be where he is and, if possible, this important interest should be accommodated.

In this case, the officer did not misjudge the situation. He was well aware that Lashinsky was a newsman, and, indeed, that he held the State Police press card identifying him and indicating that he was a responsible representative of the media. Nevertheless, after the officer had arrived at the scene and had become engrossed in dealing with the emergency, Lashinsky's obstreperous actions impeded the trooper. The officer, virtually working alone, could not, in his professional judgment, have permitted defendant to remain, even as a member of the press, and still discharge his own paramount responsibilities for the safety and welfare of those who were his immediate concern. Lashinsky was obligated, under the circumstances, to cooperate with the officer and withdraw; his failure to do so, though based on his claim of privilege as a newsperson, was plainly unlawful and constituted neither a defense to the charge nor a fact creating reasonable doubt as to his commission of the offense.

### III

Defendant also contends that the disorderly persons statute is unconstitutionally vague and overbroad as applied to a news photographer under the circumstances presented. The overlapping but distinct concepts of vagueness and overbreadth were finely articulated in *Landry v. Daley*, 280 *F.Supp.* 938, 951–952 (*N.D.Ill.*), appeal dismissed 393 *U.S.* 220, 89 *S.Ct.* 455, 21 *L.Ed.2d*

392 (1968), rev'd on other grounds, *sub nom. Boyle v. Landry,* 401 *U.S.* 77, 91 *S.Ct.* 758, 27 *L.Ed.*2d 696 (1971). There Judge Will stated:

> The concept of vagueness or indefiniteness rests on the constitutional principle that procedural due process requires fair notice and proper standards for adjudication. The primary issues involved are whether the provisions of a penal statute are sufficiently definite to give reasonable notice of the prohibited conduct to those who wish to avoid its penalties and to apprise judge and jury of standards for the determination of guilt. If the statute is so obscure that men of common intelligence must necessarily guess at its meaning and differ as to its applicability, it is unconstitutional.
>
> The concept of overbreadth, on the other hand, rests on principles of substantive due process which forbid the prohibition of certain individual freedoms. The primary issue is not reasonable notice or adequate standards, although these issues may be involved. Rather the issue is whether the language of the statute, given its normal meaning, is so broad that its sanctions may apply to conduct protected by the Constitution. Frequently, the resolution of this issue depends upon whether the statute permits police and other officials to wield unlimited discretionary powers in its enforcement. If the scope of the power permitted these officials is so broad that the exercise of constitutionally protected conduct depends on their own subjective views as to the propriety of the conduct, the statute is unconstitutional.

Among the factors to consider in assessing whether a statute could pass constitutional muster were:

> (1) whether a substantial interest worthy of protection is identified or apparent from the language of the statute; (2) whether the terms of the regulation are susceptible to objective measurement by men of common intelligence; (3) whether those charged with its enforcement are vested only with limited discretion.
>
> *Id.,* 280 *F.Supp.* at 952–953. Accord, *State v. Profaci,* 56 *N.J.* 346, 350–351 (1970).

We reject defendant's argument that insufficient standards render the statute in this case constitutionally defective either for vagueness or overbreadth. *Landry v. Daley, supra,* 280 *F.Supp.* at 951–953; *State v. Profaci, supra.* The disorderly persons statute and other like-worded laws have survived similar constitutional challenges in this State. *E. g., Camarco v. City of Orange,* 61 *N.J.* 463, 466 (1972); *State v. Smith, supra,* 46 *N.J.* at

518–519; see *State v. Manning, supra,* 146 *N.J.Super.* at 595; *State v. Furino, supra,* 85 *N.J.Super.* at 349. The statute, fairly read and properly understood, requires that a police officer, acting in good faith, be able to point to objective facts that would lead a reasonable person to realize that his conduct constituted interference with the police officer and that the officer's request that he desist was not arbitrary. The statute, in our view, adequately communicates its essential prohibition.

▮▮▮▮▮ Defendant makes the further argument that the statute is vague because, as a newspaperman with a State Police Press pass, as well as First Amendment protection, he could not be certain whether his conduct would constitute prohibited interference. It is important to emphasize that vagueness in this sense is essentially a procedural due process concept grounded in notions of fair play. *Colten v. Kentucky,* 407 *U.S.* 104, 110, 92 *S.Ct.* 1953, 1957, 32 *L.Ed.2d* 584, 590 (1972); *Lanzetta v. New Jersey,* 306 *U.S.* 451, 455, 59 *S.Ct.* 618, 620, 83 *L.Ed.* 888, 890, (1939); *Connally v. General Construction Co.,* 269 *U.S.* 385, 391, 46 *S.Ct.* 126, 127, 70 *L.Ed.* 322, 328 (1926); *State v. Profaci, supra,* 56 *N.J.* at 350; *State v. Caez,* 81 *N.J.Super.* 315, 319 (App.Div.1963); *Landry v. Daley, supra,* 280 *F.Supp.* at 951. "The underlying principle [is] that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Colten v. Kentucky, supra; United States v. Harriss,* 347 *U.S.* 612, 617, 74 *S.Ct.* 808, 812, 98 *L.Ed.* 989, 996 (1954). See, *United States v. Batchelder,* —— *U.S.* ——, ——, 99 *S.Ct.* 2198, 60 *L.Ed.2d* 755 (1979); *Dunn v. United States,* —— *U.S.* —— ——, 99 *S.Ct.* 2190, 60 L.Ed.2d 743 (1979); *Papachristou v. City of Jacksonville,* 405 *U.S.* 156, 162, 92 *S.Ct.* 839, 843, 31 *L.Ed.2d* 110, 115 (1972). A statute is unconstitutional if it is couched in terms "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Coates v. Cincinnati,* 402 *U.S.* 611, 614, 91 *S.Ct.* 1686, 29 *L.Ed.2d* 214, 217 (1971); *Lanzetta v. New*

*Jersey, supra*; *Connally v. General Construction Co., supra*; *State v. Smith, supra,* 46 *N.J.* at 518; *State v. Monteleone,* 36 *N.J.* 93, 99 (1961); *State v. Furino, supra.* The decisive question for purposes of this vagueness argument is whether the defendant was reasonably apprised, as a matter of common intelligence, in light of ordinary human experience, that his particular conduct was unlawful. In our view, a photographer, even though seeking to acquire news photos and enjoying the respectability of a State Police press card, would realize that a refusal to obey on officer's reasonable order to withdraw from the immediate scene of an accident under emergency conditions, based on objective and obvious facts, comes within the disorderly persons statute. Under these circumstances, it cannot be said that the statute is vague.

Related to these contentions is the overbreadth argument that the statute was invoked to penalize lawful activity. It is urged that there was, in fact, no interference in this case, Lashinsky was prosecuted merely because his presence "annoyed" Officer Herkloz and the trooper exercised unfettered discretion and acted arbitrarily in arresting him. We would agree that the statute would be overbroad were it to apply in situations where, from an objective standpoint, no obstructive conduct occurred requiring intercession by the police. Under such circumstances, a significant government interest would clearly be lacking and the restraint upon the press through a criminal statute would not be justified. *Branzburg v. Hayes, supra.* In this case, however, the officer was not acting with unbridled discretion, or solely out of pique or annoyance. Rather, his action was plainly reasonable in objective terms because an actual interference did occur. As construed and applied in this factual setting, the statute protects a vital State interest, securing the safety of persons involved in an emergency mishap by protecting a police officer from unjustifiable interference in the performance of his duties. See *Dayton Newspapers, Inc. v.*

*Starick,* 345 *F.2d* 677, 678–679 (6 Cir. 1965); *Channel 10, Inc. v. Gunnarson,* 337 *F.Supp.* 634, 638 (*D.Minn.*1972); *cf. Cox v. Louisiana, supra,* 379 *U.S.* at 574, 85 *S.Ct.* at 485–486, 13 *L.Ed.*2d at 498.

It is further asserted that the overbreadth of the statute is reflected in its arbitrary enforcement, consisting of the State Police issuing defendant a press pass, then not recognizing that pass at the accident scene and, thereafter, permitting other photographers to be present. Officer Herkloz's characterization, under cross-examination, of Lashinsky as a "civilian" suggests he may, in his own mind, have distinguished defendant from the "official" photographers. This, however, is not indicative of arbitrariness, bad faith or discrimination by the trooper. The State Police and Highway Authority photographers had official responsibilities, as did the trooper himself, with respect to the accident and there was good reason for them to be at the accident scene.

We are, in sum, satisfied the statute does not suffer from constitutional overbreadth or vagueness, see *Camarco v. City of Orange, supra,* 61 *N.J.* at 465–468; *State v. Profaci, supra,* 56 *N.J.* at 349–350; *State v. Zito,* 54 *N.J.* 206, 213 (1969); also, *Shuttlesworth v. Birmingham,* 382 *U.S.* 87, 91, 86 *S.Ct.* 211, 213–214, 15 *L.Ed.*2d 176, 180 (1965) and that defendant's constitutional arguments lack merit. We have already demonstrated for reasons given that defendant's other contentions are not sufficient to impugn the verdict below. We have also considered defendant's several objections to the evidentiary rulings below and have determined, without the need for particularized discussion, that none approaches the level of reversible error.

Accordingly, defendant's conviction as a disorderly person is affirmed.

HUGHES, C. J., concurring.

I concur on all points with the perceptive opinion of Justice Handler. I would add my view that the defiant and inflamma-

tory language of this reporter, his exhibitionism and its impact on the crowd of onlookers, and his rejection of emergency police authority reflected no credit upon the reputation of the responsible press. A lone state trooper attempting to make first aid attention available to an apparently dying woman pinned in a car, with the imminent added danger of fire, would have deserved, one would think, supportive cooperation by any bystander, including a member of the press. No matter its aggressive pursuit of the news and the truth, the press is bound, as are we all, to an additional standard of minimum decency and respect for the law. As well said by Justice Handler, "[t]he liberty which the press seeks to assure our people can be meaningfully enjoyed only in a society where there is an adequate measure of order." 81 *N.J.* 1, 13, (1979).

PASHMAN, J., dissenting.

I have no quarrel with the standard which the majority has espoused in judging the legality of defendant's actions. Whether a newsman's refusal to obey a police officer's command constitutes a violation of *N.J.S.A.* 2A:170–29(2)(b) must, in the final analysis, hinge upon whether "from an objective standpoint and under all of the circumstances" that command was reasonable. See *ante* at 1128. Moreover, in making such a "reasonableness" determination, we must not lose sight of the media's special role in enlightening the public with respect to current events and thus be mindful that the newsman "has a legitimate and proper reason to be where he is." *Ante* at 15.

I part company with the majority, however, in its application of this "reasonableness" test to the facts of this particular case. The only "interference" caused Trooper Herkloz by defendant consisted of the alleged distraction deriving from defendant's photographing of the scene of the accident. In no other respect can it seriously be urged that defendant—as opposed to the non-media bystanders—"obstructed" Herkloz in the performance of his duties. Defendant's actions, however, constitute the precise type of conduct in which any media photographer must

engage if he is to adequately report a news event. To characterize such conduct as an unreasonable interference with police activities is equivalent to a holding that the police may remove a newsman from the scene of an accident merely because that newsman is competently performing his job. As such, the "special access rights" of the press to which the majority pays lip service are rendered meaningless. I therefore respectfully dissent.

## I

*N.J.S.A.* 2A:170–29(2)(b), the statute which defendant allegedly violated, provides in part:

Any person who in any place, public or private, * * * [o]bstructs, molests or interferes with any person lawfully therein * * * [i]s a disorderly person.

If construed expansively, the above-cited language would seemingly prohibit any conduct which a police officer considered "annoying" or "distracting" to himself or any other member of the populace. Encompassed within the statute's proscription would be everything ranging from first degree murder to jeering at a baseball player as he comes to bat. Such an interpretation of *N.J.S.A.* 2A:170–29(2)(b), however, would clearly render the statute void for vagueness under the due process clause of the Fourteenth Amendment inasmuch as policemen would possess the power to "convert the character of an event from nonpunishable to punishable by proclamation alone." *State v. Manning*, 146 *N.J.Super.* 589, 599 (App.Div.1977) (Antell, J.A.D., dissenting); *see, e. g., Colten v. Kentucky*, 407 *U.S.* 104, 92 *S.Ct.* 1953, 32 *L.Ed.2d* 584 (1972); *Coates v. Cincinnati*, 402 *U.S.* 611, 91 *S.Ct.* 1686, 29 *L.Ed.2d* 214 (1971); *Shuttlesworth v. City of Birmingham*, 382 *U.S.* 87, 86 *S.Ct.* 211, 15 *L.Ed.2d* 176 (1965). As the Supreme Court stated in *Coates, supra* :

Conduct that annoys some people does not annoy others. Thus, [an] ordinance [making it unlawful to conduct one's self "in a manner annoying" to others] is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that

no standard of conduct is specified at all. As a result, "men of common intelligence must necessarily guess at its meaning." * * * [402 *U.S.* at 614, 91 *S.Ct.* at 1688, 29 *L.Ed.2d* at 217]

Fortunately, the courts of this State have long eschewed a literal interpretation of the language of *N.J.S.A.* 2A:170–29(2)(b). Instead, we have recognized that the statute was primarily

intended to apply only to such [persons] as shall, by their acts, intentionally obstruct or interfere with the movement of persons lawfully [situated in any place]. [*Haywood v. Ryan*, 85 *N.J.L.* 116, 118–119 (Sup.Ct.1913)]

*See, e. g., State v. Smith*, 46 *N.J.* 510, 520–521 (1966), *cert.* den., 385 *U.S.* 838, 87 *S.Ct.* 85, 17 *L.Ed.2d* 71 (1966). As such, the better reasoned decisions have upheld convictions predicated upon unlawful interference with policemen only in situations in which a defendant has purposely obstructed an officer's performance of his duties, or physically prevented the officer from carrying out such responsibilities. *See, e. g., State v. Smith, supra; State v. Furino*, 85 *N.J.Super.* 345 (App.Div.1964); *Haywood v. Ryan, supra; State v. Taylor*, 121 *N.J.Super.* 395, 399 (Cty.Ct.1972).

Through the enactment of the new criminal code, our Legislature has expressed approval of precisely such a construction of the disorderly persons statute. *N.J.S.A.* 2C:29–1 (which, effective September 1, 1979, will supersede the present *N.J.S.A.* 2A:170–29(2)(b)) provides:

A person commits a disorderly persons offense if he *purposely* obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from lawfully performing an official function *by means of intimidation, force, violence, or physical interference or obstacle,* or by means of any independently unlawful act. * * * [emphasis supplied]

Thus, under the new criminal code, the Legislature has explicitly decreed that only purposeful or physical interference with a public servant's attempt to perform his duties is illegal.

Concededly, the defendant here involved neither purposely nor physically obstructed Trooper Herkloz. Our inquiry into the legality of defendant's actions is not, however, at an end. I, as does the majority, believe that it would be unwise to so narrowly delimit the scope of *N.J.S.A.* 2A:170–29(2)(b) that policemen would be powerless to enforce reasonable commands during emergency or near-emergency situations. The State has a strong interest in keeping the public at a distance from the site of a recent crime or accident in order that the victim be more easily attended to, evidence be preserved, and the safety of the crowd not be jeopardized.

The new criminal code explicitly allows police officers to enforce such reasonable requests. *N.J.S.A.* 2C:33–7(b), effective September 1, 1979, provides in part:

> A person in a gathering commits a petty disorderly persons offense if he refuses to obey a *reasonable* official request or order to move:
>
> (1) To prevent obstruction of a highway or other public passage; or
>
> (2) *To maintain public safety by dispersing those gathered in dangerous proximity to a fire or other hazard.* * * * [emphasis supplied]

*N.J.S.A.* 2C:33–7(b) has no counterpart in our current criminal code. Nonetheless, in light of the strong public interest in allowing police officers to deal effectively with emergencies, it seems reasonable to conclude that the Legislature meant to encompass the conduct there prohibited within the ambit of *N.J.S.A.* 2A:170–29(2)(b). Thus, an individual is guilty of a disorderly persons offense if he refuses to accede to a reasonable police request given during an emergency or near-emergency situation.

In the present case, Trooper Herkloz's request that non-media bystanders leave the scene of the accident was reasonable. Herkloz, the only police officer in the vicinity of the wreck, was

required to secure the site in order that evidence of the collision be preserved and the victims' personal property not be stolen. He was also under a duty to aid the surviving victim as best he could. These tasks would have been made immeasurably more difficult if he was simultaneously compelled to keep a constant watch on the crowd. Moreover, Herkloz was understandably concerned that the safety of the on-lookers would be jeopardized by an explosion. Given these circumstances, had the non-media bystanders refused to disperse, Herkloz would have been wholly justified in making arrests for violations of *N.J.S.A.* 2A:170–29(2)(b).

Defendant was not, however, a non-media bystander. He was a news photographer engaged in the task of reporting a newsworthy event. As such, Herkloz's request that defendant leave the scene of the accident, although given in good faith, was clearly unreasonable.

## II

When on assignment, a journalist does not visit the scene of a crime or an accident simply for his own edification. He is there to gather information to be passed along to the public at large. It is precisely for this reason that the framers of the First Amendment accorded news media representatives a special right both to acquire and disseminate the news.

That the Constitution speaks separately of freedom of speech and freedom of the press "is no constitutional accident, but [rather] an acknowledgement of the critical role played by the press in American society." *Houchins v. KQED, Inc.*, 438 *U.S.* 1, 17, 98 *S.Ct.* 2588, 2598, 57 *L.Ed.*2d 553, 566 (1978) (Stewart, J., concurring). The preservation of a full and free flow of information to the general public has long been recognized as a core objective of the First Amendment. *See, e. g., Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 *U.S.* 748, 756, 96 *S.Ct.* 1817, 1822, 48 *L.Ed.*2d 346, 355 (1976);

*Procunier v. Martinez*, 416 *U.S.* 396, 408–409, 94 *S.Ct.* 1800, 1808–1809, 40 *L.Ed.*2d 224, 237 (1974); *Kleindienst v. Mandel*, 408 *U.S.* 753, 762–763, 92 *S.Ct.* 2576, 2581, 33 *L.Ed.*2d 683, 691–692 (1972).

News media, by keeping the public abreast of current events, make possible "[e]nlightened choice[s] by an informed citizenry" —"the basic ideal upon which an open society is premised * *." *Branzburg v. Hayes*, 408 *U.S.* 665, 726, 92 *S.Ct.* 2646, 2672, 33 *L.Ed.*2d 626, 666 (1972) (Stewart, J., dissenting). Not only does a free press provide people with a wide range of fact and opinion, but, "by exposing the actions of public officials, it serves as a check upon governmental error and abuse." *In re Farber*, 78 *N.J.* 259, 287, *cert.* den., 439 *U.S.* 997, 99 *S.Ct.* 598, 58 *L.Ed.*2d 670 (1978) (Pashman, J., dissenting); *see, e. g., Sheppard v. Maxwell*, 384 *U.S.* 333, 350, 86 *S.Ct.* 1507, 1515, 16 *L.Ed.*2d 600, 613 (1966); *Estes v. Texas*, 381 *U.S.* 532, 539, 85 *S.Ct.* 1628, 1631, 14 *L.Ed.*2d 543, 548 (1965). As such, it is an "incontestable precondition of self-government." *Branzburg, supra*, 408 *U.S.* at 726, 92 *S.Ct.* at 2672, 33 *L.Ed.*2d at 666 (Stewart, J., dissenting).

It is therefore not surprising that a majority of the Justices who participated in *Houchins, supra*, recognized that in certain circumstances the press must be allowed greater access to newsworthy events than that accorded the general public. *See* 438 *U.S.* at 16, 98 *S.Ct.* at 2598, 57 *L.Ed.*2d at 566 (Stewart, J., concurring); *id.* at 31, 98 *S.Ct.* at 2605, 57 *L.Ed.*2d at 575–577 (Stevens, J., joined by Brennan and Powell, JJ., dissenting).

In New Jersey, the State Police have sought to insure that this special access right is preserved by issuing "press cards" to representatives of the media. As testified to below by Lieutenant Gordon Hector, Chief of the State Police Information Bureau, this press card identifies its possessor as a responsible individual engaged in a task deeply affected with the public

interest, and thus "as an individual who in the discretion of [a] police officer can proceed beyond that point where the public goes if it fits in with what is going on at the time."

The press card does not purport to grant newsmen a *carte blanche* to wander wherever they may choose. Media representatives remain obligated under *N.J.S.A.* 2A:170–29(2)(b) to accede to the reasonable commands of police officers. However, as the majority emphasizes, in making this "reasonableness" determination, we must be ever mindful that "such an individual has a legitimate and proper reason to be where he is." *Ante* at 15. In the words of Justice Stewart:

> terms of access that are reasonably imposed on individual members of the public may, if they impede effective reporting without sufficient justification, be unreasonable as applied to journalists who are there to convey to the general public [the information which they will acquire]. [*Houchins, supra,* 438 *U.S.* at 17, 98 *S.Ct.* at 2598, 57 *L.Ed.*2d at 566 (Stewart, J., concurring)]

I therefore agree with the majority that "whether [this] newsperson's conduct [was] disorderly must turn on whether from an objective standpoint and under all of the circumstances, the policeman's order to the newsman was reasonable, taking into account the special role performed by the press." *Ante* at 15. What I cannot subscribe to is the wholly unreasonable manner in which the majority has applied this test to the facts of the present controversy.

### III

Although the majority attempts to convey a contrary impression, it is clear from the evidence adduced below that the only "interference" caused Trooper Herkloz by defendant consisted of defendant's photographing of the scene of the accident. In no other respect did defendant, who was 15 to 20 feet away from the wreck, "obstruct" Herkloz in the performance of his duties. Consequently, Herkloz's order that defendant leave the site was clearly unreasonable.

The majority emphasizes that defendant became embroiled in a heated exchange with Herkloz which both directly and indirectly interfered with the carrying out of Herkloz's duties. While engaged in the argument, the majority maintains, Herkloz was forced to neglect his police responsibilities. Moreover, the argument attracted many non-media bystanders back to the scene of the accident.

What the majority fails to emphasize, however, is that this argument erupted *after* and as a direct result of Herkloz's order that defendant move on. A command which is unreasonable when uttered does not become reasonable simply because a newsman will not abide by its terms. And this is so despite the fact that the command was issued in good faith. In effect, the majority has ruled that a newsman acts illegally if he stands up for his rights and refuses to accede to an arbitrary, and hence unlawful, request. If Herkloz's initial order to move back was unreasonable, any distractions caused by the ensuing argument were of his own making—not that of defendant.[1]

The majority also intimates that the non-media bystanders would not have dispersed had defendant been allowed to remain in the vicinity of the wreck. Even assuming that such was the case, Herkloz's order that defendant move on was still unreasonable. As detailed in Part I, *supra*, Herkloz had ample justification to request non-media bystanders to disperse. If any of these individuals refused to be bound by such an order—whether or not such a refusal was predicated upon defendant's presence—Herkloz could, and should, have arrested them for violations of *N.J.S.A.* 2A:170–29(2)(b).

---

[1]The concurring opinion emphasizes that media representatives, like all other members of the populace, must obey the law's strictures. As to this conclusion no one would disagree. The question presented in this case is not, however, whether journalists must obey the law—rather, at issue in this case is the scope of *N.J.S.A.* 2A:170–29(2)(b) and whether the actions taken by this particular defendant did indeed violate that law.

The unreasonable conduct of these individuals, however, cannot be cited as justification for Herkloz's arrest of defendant—a newsman who was reasonably exercising his special access right to newsworthy events. It would be absurd to rule that a media representative forfeits this special access right merely because others over whose actions he has no control refuse to abide by a reasonable police request. The majority would rather penalize the press than condemn the actions of the non-media lawbreakers.

Thus, we are led back to the inescapable conclusion that the only "interference" caused by defendant consisted of his photographing of the event. The majority suggests that this "interference" was substantial inasmuch as defendant's presence diverted Herkloz's attention from the task of aiding the victim to that of insuring that the victim's personal property was not stolen. Moreover, Herkloz was concerned that defendant's safety would be jeopardized.

Again, the majority fails to apply its own admonition that media representatives have greater access to newsworthy events than do members of the public. In *any* accident, personal property will be strewn about and some risk will exist that an overturned vehicle will burst into flames. If these circumstances alone justify a police order that newsmen leave the vicinity, I am at a loss to envision any situation involving an auto wreck in which such a command will be deemed "unreasonable." Thus, having paid lip service to the special access rights of the media in Part II of its opinion, the majority in Part III has basically decreed that no such rights exist.

The press card carried by defendant and shown to Trooper Herkloz identified defendant as a responsible individual engaged in the important task of bringing a newsworthy event to the attention of the public at large. Herkloz therefore acted unreasonably in assuming that this responsible individual—as opposed to the non-media bystanders—might tamper with evidence lying about or abscond with the victims' personal property. In the

absence of proof to the contrary, he should rather have presumed that defendant would attend only to his job of photographing the scene.

Likewise, Herkloz should have realized that, as a card-carrying member of the press, defendant was sufficiently mature to evaluate the safety risks posed by the overturned vehicle and to position himself so as to minimize those risks. This is not to say that newsmen must be allowed access to any site, no matter what the risk of harm might be. Where, however, as in the present case, the risk is not substantial, a media representative should be allowed to situate himself in relatively close proximity to the vehicle. The majority's holding to the contrary in effect allows the police to remove any newsman from the scene of any accident merely because that newsman is competently performing his job. As such, the press's right of special access is rendered meaningless.

### Conclusion

This case marks the second occasion this Term in which a majority of the members of this Court have lauded the virtues of a free press and then proceeded to deny newsmen the rights to which they are both constitutionally and statutorily entitled. As in *In re Farber*, 78 *N.J.* 259 (1978), the majority has today extolled the workings of news media personnel and proclaimed to all the world their right of special access to newsworthy events. And just as in *Farber*, the majority has disregarded its own strictures and branded the newsman here involved a criminal.

I would reverse defendant's conviction and hold that the conduct in which he engaged did not constitute a violation of *N.J.S.A.* 2A:170–29(2)(b).

CLIFFORD, J., dissenting.

With due deference to the views of my brethren and to those of able counsel, I fear the Court has been lured into treating a

case of small moment, despite its ability to spawn four opinions, as precipitating a major First Amendment confrontation with the press. *Cf. State v. Saunders,* 75 *N.J.* 200, 228 (1977) (dissenting opinion). While I quite agree with the majority that defendant's conduct under the circumstances hardly brings credit or distinction to the press, the fact remains that his arrogant behavior, the more appalling because of the tragic circumstances in which it was exhibited, does not constitute a violation of *N.J.S.A.* 2A:170–29(2)(b) under any proper construction of this statute.

This is not to say, however, that the State cannot proscribe such conduct. As correctly noted by Justice Pashman, the new Code of Criminal Justice, not yet in force, includes provisions which seem to be tailored precisely to punish boorish behavior such as that demonstrated by this defendant. Without passing directly on the constitutionality of statutes not before us, I would note only that this defendant might be found guilty under a properly drafted and narrowly construed statute. In this case, however, an overly-eager prosecution has succeeded in convincing the Court to punish a failure to "move on" by expediently converting an "interference" statute to that purpose.

However, it is unnecessary to detail the due process problems which might be posed by such a transubstantiation, see *Coates v. Cincinnati,* 402 *U.S.* 611, 614, 91 *S.Ct.* 1686, 29 *L.Ed.*2d 214 (1971), because even assuming that *N.J.S.A.* 2A:170–29(2)(b) could be invoked as a "move on" statute without violating the constitution, this conviction would still suffer from a failure of the constitutionally required proofs. *N.J.S.A.* 2A:170–29(2)(b) makes it a disorderly persons offense to obstruct, molest or interfere with any persons lawfully in any public or private place. The enactment is so wide ranging, both in terms of the conduct it touches and the places in which it is applicable, that one must give it a narrowing construction in order to save it from the defect—fatal, as a matter of constitutional law—of

vagueness. The need for such a limiting construction of this statute and its predecessors has long been recognized by the courts. See the course of judicial treatment accurately traced by Judge Antell in *State v. Manning*, 146 *N.J.Super.* 589, 598 (App.Div.1977) (dissenting opinion).

Likewise is a restricted interpretation strongly suggested by the United States Supreme Court's treatment of similar enactments. In *Shuttlesworth v. City of Birmingham*, 382 *U.S.* 87, 86 *S.Ct.* 211, 15 *L.Ed.*2d 176 (1965), a municipal ordinance made it unlawful for a person "to stand or loiter upon any street or sidewalk * * * after having been requested by any police officer to move on." The enactment withstood a constitutional attack of *facial* invalidity only because the Alabama Court of Appeals, subsequent to petitioner's conviction, had "given to it an explicitly narrowed construction," under which a conviction for failure to "move on" after a police officer's request could not stand absent a showing that the person so ordered was actually "blocking free passage." 382 *U.S.* at 91, 86 *S.Ct.* at 213. Similarly, in *Colten v. Kentucky*, 407 *U.S.* 104, 92 *S.Ct.* 1953, 32 *L.Ed.* 2d 584 (1972), a more narrowly-drawn statute, specifically punishing the refusal to "comply with a lawful order of the police to disperse" after congregating with other persons in a public place, required that the refusal be motivated by the "intent to cause public inconvenience, annoyance or alarm * * *." Given the state trial court's specific finding of the essential ingredient of such intent, the Supreme Court found nothing unconstitutional in the manner in which the statute had been applied. 407 *U.S.* at 108–09, 92 *S.Ct.* at 1956.

The lesson to be drawn from these decisions is that the enactment in question, if it is to have a constitutionally permissible formulation, must be construed as requiring a showing of actual *physical* interference (*Shuttlesworth*) or an *intent* to interfere (*Colten*). Quite plainly, the State proved neither here.

The county court on the trial *de novo* commendably made precise and specific findings leading to the following conclusion:

that in attracting the attention of the officer by backing up and coming forward and backing up and coming forward [the defendant] interfered with this officer in the performance of what I believe to have been his proper duty.

Hence it is abundantly clear that the State's proofs failed to demonstrate, and the trial court did not find, either a physical interference or an intent to interfere with the trooper on the scene, no matter how else defendant was making an extraordinary nuisance of himself.

Deplorable as defendant's conduct may have been under the circumstances, it fell short of what is required to convict under this statute if it is to be constitutionally interpreted. I would reverse the judgment of conviction and remand to the trial court for entry there of a judgment of acquittal.

Justice MOUNTAIN joins in this dissenting opinion.

*For affirmance*—Chief Justice HUGHES and Justices SCHREIBER and HANDLER and Judge HALPERN—4.

*For reversal*—Justices MOUNTAIN, PASHMAN and CLIFFORD—3.